719 S.E.2d 876

**STATE of West Virginia, Plaintiff Below, Respondent**

v.

**Rhonda Kay STEWART, Defendant Below, Petitioner.**

No. 101179.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 18, 2011.

Decided Nov. 28, 2011.

Gregory L. Ayers, Esq., Deputy Public Defender, Charleston, WV, for the Petitioner.

Darrell V. McGraw, Jr., Attorney General, Thomas W. Rodd, Esq., Assistant Attorney General, Charleston, WV, for Respondent.

Kevin Baker, Esq., Baker & Brown, PLLC, Charleston, WV, for Amicus Curiae, West Virginia Coalition Against Domestic Violence and the National Clearinghouse for the Defense of Battered Women.

KETCHUM, J.:

Rhonda Kay Stewart ("defendant") appeals her conviction in the Circuit Court of Kanawha County for the first degree murder of her husband. The trial court observed at sentencing that the defendant was *"abused throughout her life ... by the man she killed."* However, at trial, the circuit court prohibited the defendant from presenting evidence that she had been battered and abused by her husband during their thirty-eight-year marriage. The trial judge did not allow eyewitnesses to testify about this abuse, and did not allow an expert witness to testify as to how this abuse may have affected the defendant's state of mind and reasoning as it related to premeditation, malice or intent.

*If the jury had been allowed to hear the abuse evidence, it could have reasonably found that the abuse affected the defendant's reasoning, and that she did not act with premeditation or malice, two required elements of first degree murder. The defendant does not rely on this evidence to excuse her from responsibility; instead, the evidence was to mitigate the offense. To receive a fair trial, the defendant, whom the trial judge observed was "abused throughout her life ... by the man she killed," was entitled to present evidence that her crime was not first degree murder, but second degree murder or manslaughter. This has been our law for decades.*

Based on well-established West Virginia precedent, the defendant was entitled to present evidence of Battered Woman's Syndrome and evidence of abuse through eyewitnesses and expert witnesses. *See, e.g.,* Syllabus Point 4, *State v. Harden,* 223 W.Va. 796, 679 S.E.2d 628 (2009) (in cases not involving self-defense, evidence of abuse is "relevant and may negate or tend to negate a necessary element of the offense(s) charged, such as malice or intent."); Syllabus Point 5, *State v. Steele,* 178 W.Va. 330, 359 S.E.2d 558 (1987) ("[e]xpert testimony can be utilized to explain the psychological basis for the battered woman's syndrome and to offer an opinion that the defendant meets the requisite profile of the syndrome.").

The defendant did not get a fair trial. We reverse the defendant's conviction and remand this matter for a new trial.

## I.

### Background

The defendant, with one of her daughters, went to the Medical Intensive Care Unit

("MICU") at Charleston Area Medical Center to visit her husband, who had only hours earlier been taken off of a ventilator. At the time, the defendant was fifty-four years old and had been married for thirty-eight years (the defendant met her husband when she was fourteen years old and married him when she was sixteen years old). However, while still married, the defendant and decedent were estranged, with the defendant staying in the marital home located on an island in a river, and the decedent staying in a camping trailer on the river bank.

Shortly after arriving in her husband's hospital room, the husband ordered the defendant and their daughter to leave. When a nurse asked the husband if he knew who was there, he responded by saying that he did and it was "Rhonda Kay Boyd," the defendant's maiden name. After being ordered to leave, the defendant and her daughter separated, and the defendant returned to her home.

After arriving home, the defendant claims that she decided to return to the hospital and commit suicide in the presence of her husband even though she "knew . . . that without [her] there, the girls, the girls would have to be hurt," but that she "wouldn't feel the pain." When later asked why she did not just take her life then if that was her intent, the defendant explained that she "wanted [her husband] to know, [she] wanted him to know that [she] wouldn't bother him anymore." Asked why it was important for her husband to know, the defendant explained that "[b]ecause—because it was—it had lasted so long." After deciding to take her own life, the defendant wrote a note to her daughters, retrieved a pistol, and returned to the hospital. When asked what she was thinking, the defendant testified that "I wanted to stop the pain. I wanted to stop the pain. I wanted to stop the pain."

Arriving in her husband's hospital room, the defendant found him sleeping. It was when she went to wake him that her pistol discharged:

> I stepped into the bed. And I reached across him. And I nudged him. And he opened his eyes, and I was going to do this. I was going to do this, and he pulled

my elbow down and pulled it down. And my—it was so fast. It was so fast. It was so fast. It was so fast. It was—there was blood. There was blood. There was blood. And I was—I needed to get help. I needed to get—I turned, I walked. I was walking. I knew [an ICU nurse] was there. I knew . . . she could help. I knew she could.

After the shooting, the defendant said that she remembered walking and that she "needed to get help. I was walking and I couldn't walk anymore. I couldn't move my legs. I needed to get help. My legs wouldn't go anymore."

Eyewitness testimony to the event included that of the health unit coordinator for the MICU unit. This witness testified that when the decedent's "monitor was ringing off," she looked up and saw the defendant "standing there with a gun to [his] head." Other hospital staff testified to seeing the defendant enter the MICU unit and that nothing appeared out of the ordinary until they heard the gunshot.

Following the shooting, the defendant walked from her husband's hospital room, handed the pistol to a doctor, went to a corner, lay on the floor and curled into a fetal position, crying. Police then arrived and the defendant was taken to the police station for questioning. A video of that questioning shows the defendant to have been extremely distraught, at times sobbing uncontrollably. When a detective asked why she went and got the pistol, the defendant stated: "Oh God . . . can't take any more pain." The defendant related that the decedent had been abusive and cruel towards her and their two daughters.

The defendant was arrested and subsequently indicted for first degree murder. In preparation for trial, the defense retained Dr. David Clayman, a clinical and forensic psychologist versed in Battered Woman's Syndrome, to evaluate the defendant and offer an opinion as to how the defendant's history of abuse may have affected her mental condition at the time of the shooting. Dr.

Clayman's report stated,[1] in part, that:

> If the information gathered is credible, she has a long history as a victim of verbal, emotional, physical, and sexual spousal abuse. These factors will justify consideration of the degree to which her status as a battered woman might be contributory to her mental state that led up to the shooting.[2]

Dr. Clayman's report was also described during the pretrial hearing as having concluded that the defendant "fits the mold of a battered spouse," "meets the definition of a 'battered spouse,'" "was suicidal just prior to [killing] her husband." The report also was described as concluding that the decedent's behavior "fits some of the characteristics of an individual who is comitting [sic] ongoing abuse."

The prosecution's theory of the case was that the defendant's actions reflected the intentional, malicious, and premeditated killing of a helpless man. Prior to trial the prosecution filed four motions *in limine*. These motions sought to exclude any testimony that the defendant had been abused by the decedent, and that she met the requisite profile of Battered Woman's Syndrome.

On the morning that the defendant's trial was to begin, the trial court held a hearing on the prosecution's motions. During the hearing, the trial court asked the prosecution to explain "the law on that in terms of the [battered woman's] syndrome and the causal connection between the actions of—the alleged actions of the defendant and the decedent, and the use of it as a defense?" In reply, the prosecution reiterated its arguments that while "battered spouse syndrome . . . goes to negate criminal intent," it has "historically been used in . . . the context of self-defense." In the defendant's case, self-defense could not be claimed because the decedent posed no "immediate threat" to the defendant "at anytime during that day or several days prior" to the shooting. The key issue the trial court needed to determine was "[w]hether this defendant felt like she was in imminent danger of being hurt, harmed or killed" by the decedent at the time she shot him. The prosecution contended that as opposed to acting in self-defense, the defendant was "angry because the [decedent] referred to her by her maiden name, what [the defendant] felt to be a symbol of disrespect."

The defense disagreed with the prosecution's interpretation of the law and, citing Syllabus Point 4 of *State v. Harden*, 223 W.Va. 796, 679 S.E.2d 628 (2009),[3] argued that "imminency" of danger was not the proper standard for determining the admissibility of a defendant's history of abuse in cases where self-defense was not being asserted. Instead, the defendant was entitled to introduce her history of abuse "occurring over the many years leading up to th[e] date" of the alleged crime without regard to issues of imminency. The defense argued that evidence of the Battered Woman's Syndrome can "be introduced to address [a defendant's] *mens rea* at the time of [an] alleged act" in any case.

Defense counsel explained to the trial court that the evidence would not prove the defendant innocent of any crime, but rather would be an alternative defense to show that her crime was not first degree murder:

> TRIAL COURT: . . . what you are saying is that she has—that the jury ought to be entitled to find some *less degree of culpability* based on the fact that your position is that she was previously abused. Correct?
>
> DEFENSE COUNSEL: Yes, Your Honor.

---

1. Dr. Clayman's report was not made part of the record; however, the report was read by the trial judge at the hearing on the prosecution's motion to exclude his testimony and the record contains several instances where the report was discussed, quoted and paraphrased by the parties and trial judge.

2. Proffer of defense counsel, quoting Dr. Clayman's report.

3. Syllabus Point 4 of *State v. Harden*, states as follows:

 Where it is determined that the defendant's actions were not reasonably made in self-defense, evidence that the decedent had abused or threatened the life of the defendant is nonetheless relevant and may negate or tend to negate a necessary element of the offense(s) charged, such as malice or intent.

TRIAL COURT: And as a result of her being previously abused, she carried that poison in her body.

DEFENSE COUNSEL: Yes.

TRIAL COURT: Through the course of this conduct.

DEFENSE COUNSEL: That is the question.

TRIAL COURT: Or was it in her mind. The psychologist intends to opine it was in her mind. That this poison of abuse was in her mind.

. . .

TRIAL COURT: And ... that the jury should be able to consider that through the testimony of the psychologist to determine that she was *less culpable* for killing her husband in this way?

DEFENSE COUNSEL: Yes, sir. Or less—*had less ability to formulate say previous position or premeditated.*

(Emphasis added.).

The trial court ruled that the defendant could not introduce, through her expert or eyewitnesses, or through cross-examination of the prosecution's witnesses, evidence of her prior abuse or any evidence regarding Battered Woman's Syndrome. However, the trial court did hold that the defendant could testify to her history of abuse, but reiterated that the defendant's eyewitnesses and expert would not be allowed to testify about abuse or Battered Woman's Syndrome. Seeking clarification, the prosecution asked: "I take that to mean the Court has ruled that domestic battery, the battered spouse syndrome is not admissible[?]" The trial court replied, "I have already done that. That's twice." The defense then sought its own clarification whether the ruling meant that the defendant's expert could not testify.[4] In response, the trial court reiterated:

... the Court has ruled as this case goes, that that opinion testimony, you know, can't come in. It does not go to weight. It does not go to question of fact. It goes to admissibility at this time. And everything that Dr. Clayman could say is admissible or not admissible, and the Court is

saying no. That's a matter of law at this time. Under the facts of this case.

Later, the trial court further explained that:

I'm just saying that there is no case law that existed in West Virginia that extends that defense to this remoteness in time. There is no evidence in this case, objective evidence in the case, that anything happened in the hours or time period immediately proceeding this.

Defense counsel objected to the trial court's exclusion of abuse evidence, as well as its conclusion that no abuse had occurred close in time to the decedent's death. On this latter objection, the defense argued that the trial court was relying on the prosecution's assertions as opposed to hearing the actual evidence.

At the conclusion of the defendant's trial she was found guilty of first degree murder. At sentencing, the trial court observed that the defendant had been *"abused throughout her life ... by the man she killed."* The defendant was sentenced to life imprisonment with the possibility of parole. It is from this conviction and sentence that she now appeals.

## II.

### Standard of Review

 The dispositive issues in this appeal relate to the trial court's exclusion of the defendant's Battered Woman's Syndrome evidence and the decedent's history of physically and mentally abusing the defendant. In Syllabus Point 10 of *State v. Huffman,* 141 W.Va. 55, 87 S.E.2d 541 (1955),[5] we held that "[t]he action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." In *State v. Blake,* 197 W.Va. 700, 478 S.E.2d 550 (1996), Justice Cleckley, writing for the Court, held that:

---

4. The trial court refused to hear Dr. Clayman's proposed testimony *in camera.*

5. *Overruled on other grounds by State ex rel. R.L. v. Bedell,* 192 W.Va. 435, 452 S.E.2d 893 (1994).

Although erroneous evidentiary rulings alone do not lead to automatic reversal, a reviewing court is obligated to reverse where the improper exclusion of evidence places the underlying fairness of the entire trial in doubt or where the exclusion affected the substantial rights of a criminal defendant.

Syllabus Point 4, in part, *State v. Blake, id.*

We apply these standards to the record before us.

## III.

### Discussion

The defendant assigns as error the trial court's pretrial ruling barring her from introducing evidence, through eyewitnesses and expert witnesses, that she met the requisite profile of Battered Woman's Syndrome, and that her husband had physically and mentally abused her during the course of their thirty-eight-year marriage.

In its brief to this Court, the prosecution argues that the trial court did not commit reversible error in its pretrial rulings regarding the defendant's abuse evidence, and that any error that might have occurred on that issue was not properly preserved for appeal. In explaining this argument, the prosecution maintains that all of the trial court's pretrial rulings regarding the defendant's abuse evidence were preliminary and that the trial court expressly reserved the right to revisit those rulings as the evidence came in during the defendant's trial; however, the defendant never asked the trial court to revisit its rulings. The prosecution also noted that even though the trial court's pretrial ruling expressly allowed her to testify about her history of being abused, the defendant did not testify that her husband abused her.

The prosecution further argues that abuse evidence was not relevant at the defendant's trial because the defendant's primary defense was that her husband's death was an accident—not that she had killed her husband as a consequence of any domestic abuse.

The issues, based on these facts, are twofold: first, the finality of the trial court's pretrial rulings excluding the defendant's abuse evidence; and, second, the relevancy and admissibility of the defendant's abuse evidence as negating, or tending to negate, malice and premeditation.

### III–A.

### *Finality of the Trial Court's Ruling Excluding Abuse Evidence*

In its brief to this Court, the prosecution argues that the trial court clearly specified at the pretrial hearing that its exclusion of the defendant's history of abuse and Battered Woman's Syndrome was preliminary, and that the trial court made those rulings with the express caveat that it would revisit them as the evidence came in. The record does show that the initial statements of the trial court support the prosecution's argument; however, at the end of the hearing the trial court held that:

> ... only two ways that the abuse would get in is if there was a diagnosable abused spouse syndrome.[6] There isn't one. Prior by an expert. There isn't one, either one of the experts. Or secondly, that it is self-defense. There isn't any evidence of self-defense. No evidence of self-defense in this case.

There is no question that this ruling was final. A review of the trial transcript makes it abundantly clear that the parties, and the trial court, also considered the pretrial ruling excluding abuse evidence as final. This is made apparent from several instances in the record where the prosecution, when objecting to defense witnesses or seeking to limit the content of a witness's testimony, relied on the trial court's pretrial ruling as final. One example of this comes from an *in cam-*

---

**6.** By "diagnosable," the trial court was referring to its earlier finding that Dr. Clayman must be prepared to testify that the defendant suffered from Battered Woman's Syndrome to a reasonable degree of medical certainty. Because Dr. Clayman's report only opined that the defendant met the requisite profile of the syndrome, the trial court ruled that Dr. Clayman failed to meet the trial court's belief as to the appropriate standard for admitting opinion testimony on Battered Woman's Syndrome.

*era* hearing held during the trial when the defense called its expert witness to the stand. During this hearing, the trial court offered its observation that Dr. Clayman's testimony was not relevant because the "[o]nly defense in this case is self-defense battered spouse." In response, defense counsel said that it was not putting on a battered spouse argument "[a]fter the Court excluded battered spouse syndrome." When the prosecution was asked its position on Dr. Clayman's testimony, the prosecution stated:

> That's fine. If he stays within the rules, that's fine. He's not to discuss any kind of diagnosis or any discussion about any domestic violence in the past.
>
> . . .
>
> No discussion about domestic battery. No domestic.

At the end of the *in camera* hearing, the trial court reaffirmed its prior ruling, holding that Dr. Clayman could testify that the defendant was suicidal "as long as he doesn't get into battered spouse."

A similar *in camera* hearing was held when the defense called the defendant's sister to the stand. The prosecution objected to the witness being called, and asked the trial court to require the defense to explain the basis of her testimony. The prosecution asserted that "[t]he State wants to make sure [the defendant] does not contravene the Court's order with regard to the exclusion of domestic battery evidence." The trial court followed up this statement by saying to defense counsel that "[t]hey want to make sure there is no violation of the previous order."

Our review leads us to conclude that while the trial court may have vacillated in terms of the finality of its rulings earlier in the pretrial hearing, the ruling made towards the end of the pretrial hearing was unequivocal—the defendant could not introduce evidence of domestic abuse through eyewitnesses or have her expert testify about Battered Woman's Syndrome.

---

**7.** While the syndrome is termed "Battered Woman's Syndrome," some courts have recognized that it is applicable generally to intimate partner relationships. *See, e.g., Smith v. State*, 268 Ga. 196, 199 n. 3, 486 S.E.2d 819, 822 n. 3 (1997).

## III–B.

### *Relevancy and Admissibility of the Defendant's Abuse Evidence as Negating, or Tending to Negate, Malice and Premeditation*

At trial, the defendant claimed the shooting death of her husband was an accident. The defendant also sought to present an alternative defense based on Battered Woman's Syndrome by showing that her thirty-eight-year history of being abused by the decedent affected her reasoning, beliefs, perceptions, or behavior, and that she did not act with malice or premeditation. In this alternative defense, the defendant was not seeking an acquittal; instead, she sought to mitigate her crime to one of the lesser included offenses of second degree murder or manslaughter.

It is clear from the record that the prosecution and trial court failed to fully understand the relevancy and admissibility of evidence that a defendant meets the requisite profile of Battered Woman's Syndrome, or evidence that a defendant had been the victim of repeated domestic abuse. Accordingly, we give a brief overview of this issue.

### III–B–1.

### *Battered Woman's Syndrome*

As a general proposition, Battered Woman's Syndrome provides a clinical explanation of the psychological mindset, and behavior, of a woman who has been physically or mentally abused over a period of time by a domestic partner.[7] *See generally*, Walker, Lenore, *"The Battered Woman"* (Harper & Row, 1979); Walker, Lenore, *"The Battered Woman Syndrome"* (2d ed., 2000); Lenore E. Walker, *Psychology and Law Symposium: Women and the Law*, 20 Pepp. L.Rev. 1170 (1993).[8]

A review of our cases on Battered Woman's Syndrome makes clear that the syn-

---

**8.** The concept of Battered Woman's Syndrome as originated by Dr. Walker is used in explaining the behavior of battered women who do not leave their domestic partners who abuse them.

drome has been part of our jurisprudence for more than three decades, and that West Virginia was one of the first states in the nation to recognize that the syndrome could aid a jury in understanding a defendant's mental state at the time of an alleged crime. In *State v. Dozier*, 163 W.Va. 192, 255 S.E.2d 552 (1979), we commented that the defendant was entitled:

> to elicit testimony about the prior physical beatings she received in order that the jury may fully evaluate and consider the defendant's mental state at the time of the commission of the offense. *State v. Hardin*, 91 W.Va. 149, 112 S.E. 401 (1922); *See generally*, 6 Pepperdine L.Rev. *"The Battered Wife Syndrome: A Potential Defense to a Homicide Charge"* 213–219 (1978).

*Id.*, 163 W.Va. at 197–198, 255 S.E.2d at 555. We again took up Battered Woman's Syndrome in *State v. Duell*, 175 W.Va. 233, 332 S.E.2d 246 (1985),[9] where the trial court prohibited Duell's expert from giving a full explanation of "indices of the [defendant's] mental status," *id.*, 175 W.Va. at 240, 332 S.E.2d at 253, including Duell's "inconsistent ability to recall the events surrounding her husband's death." In reversing Duell's conviction, we held that "the trial court's restriction on the testimony ... constituted reversible error." *Id.*

■ In 1987, we held in Syllabus Point 5 of *State v. Steele*, *supra*, that "[e]xpert testimony can be utilized to explain the psychological basis for the battered woman's syndrome and to offer an opinion that the defendant meets the requisite profile of the syndrome."[10] In *State v. Wyatt*, 198 W.Va. 530, 542, 482 S.E.2d 147, 159 (1996), "we recognize[d] battered women's syndrome as a particularized version of post-traumatic stress disorder, of which, for instance, rape-trauma syndrome is another example ...

and anticipate that the testimony of a knowledgeable expert on those subjects ... will assist the trier of fact in determining the issues of criminal intent." More recently, in *State v. Harden*, 223 W.Va. 796, 679 S.E.2d 628 (2009), we closely examined our precedent on the issue of abuse evidence and its relevancy, as well as cases from other jurisdictions, and concluded that evidence of abuse is "relevant and may negate or tend to negate a necessary element of the offense(s) charged, such as malice or intent." Syllabus Point 4, in part, *Harden*, *id.* *See also Wickline v. House*, 188 W.Va. 344, 424 S.E.2d 579 (1992). *See generally* Jeffrey M. Shawver, *Battered by Men, Bruised by Injustice: the Plight of Women Who Fight Back and the Need for a Battered Women Defense in West Virginia*, 110 W. Va. L.Rev. 1139 (1988).

■ Our prior cases make clear that in cases involving Battered Woman's Syndrome, evidence that a defendant meets the profile of the syndrome is admissible to explain to the jury how domestic abuse may affect a defendant's reasoning, beliefs, perceptions, or behavior. This evidence is relevant because it may negate an essential element of the crime charged, such as premeditation, malice or intent. If premeditation is negated, then the defendant may only be convicted of second degree murder. If malice is negated, then the defendant may only be convicted of manslaughter.

### III–B–2.

### *Exclusion of the Defendant's Abuse Evidence*

The trial court agreed with the prosecution's argument that the defendant's history of abuse was not relevant because her case

---

9. Our decision in *Duell* was superceded by rule following our adoption of the West Virginia Rules of Evidence. *See State v. Sutphin*, 195 W.Va. 551, 466 S.E.2d 402 (1995). However, we expressly held in *Sutphin* that *Duell* remained a "source of guidance." *State v. Sutphin*, 195 W.Va. at 562, 466 S.E.2d at 413.

10. The admissibility of a defendant's history of being abused is not conditioned on the defendant being found to meet the requisite profile of Battered Woman's Syndrome, or the defendant having an expert to testify in her behalf. Stated differently, while having an expert testify that a defendant meets the requisite profile of Battered Woman's Syndrome is very helpful, and perhaps even essential, in explaining the significance and relevance of a defendant's history of abuse, a defendant is entitled to introduce her history of abuse through eyewitnesses, her own testimony, and means other than the testimony of an expert witness.

did not involve a claim of self-defense and that her evidence of abuse was too remote. The trial court also ruled that Dr. Clayman could not testify about Battered Woman's Syndrome, or the defendant's history of abuse, because he did not "diagnose" the defendant as meeting the profile of Battered Woman Syndrome to a reasonable degree of medical certainty.

■ *Lack of self-defense not a basis for excluding abuse evidence:* In her appeal, the defendant argues that our precedent, discussed *supra,* makes clear that her history of being a battered and abused woman is relevant to her state of mind even when self-defense is not being asserted. We agree.

■ In *State v. Harden, supra,* we expressly rejected the type of argument advanced by the prosecution. We held in *Harden* that the relevancy of a defendant's history of abuse was *not dependent* on a claim of self-defense:

> Where it is determined that the defendant's actions were not reasonably made in self-defense, evidence that the decedent had abused or threatened the life of the defendant is nonetheless relevant and may negate or tend to negate a necessary element of the offense(s) charged, such as malice or intent.

*Id.,* at Syllabus Point 4.

■ Syllabus Point 4 of *Harden* clarifies, in a single point of law, that evidence of prior abuse is relevant to a defendant's reasoning, beliefs, perceptions, or behavior at the time of the alleged criminal act. *Harden,* and the cases preceding that decision, recognize that the perceptions of a battered and abused person are different from the perceptions of a person who has not lived through an abusive relationship. These cases recognize that an abused person will sometimes behave "irrationally" and that a defendant should be permitted to offer an explanation for that behavior. We emphasize "irrationally" be-

cause that term is typically measured by, or in comparison to, an "ordinary reasonable person." It is clear, however, that an "ordinary abused person," particularly a person who has endured abuse to the extent that they exhibit the characteristics of Battered Woman's Syndrome, may reason and react quite differently from someone who has not been abused.

■ *Harden* also made clear that when a defendant's state of mind is in issue, the defendant's history of abuse is a question of fact to be considered by the jury. The jury is entitled to have a full understanding of the facts before being asked to judge the defendant.[11]

■ *Expert Witness Testimony on Battered Woman's Syndrome:* The trial court ruled that Dr. Clayman did not "diagnose" the defendant as meeting the requisite profile of Battered Woman's Syndrome to a reasonable degree of medical certainty. Therefore, he could not testify about the syndrome or the defendant's history of abuse. While our precedent makes clear that an expert must form his or her opinion to a reasonable degree of certainty, we made clear in Syllabus Point 5 of *State v. Steele, supra,* that "[e]xpert testimony can be utilized to explain the psychological basis for the battered woman's syndrome *and to offer an opinion that the defendant meets the requisite profile of the syndrome.*" (Emphasis added). The correct standard then is not as the trial court found; instead, the applicable standard is that the expert must form his or her opinion to a reasonable degree of certainty that the defendant "meets the profile" of Battered Woman's Syndrome. Stated differently, it is not that the defendant is "diagnosed" with the syndrome, but rather that *she exhibits the characteristics of an abused and battered person and meets the requisite profile* of Battered Woman's Syndrome.[12]

11. We note that the jury appeared to struggle with the issue of premeditation—even in the absence of knowing that the defendant was an abused woman who allegedly met the requisite profile of Battered Woman's Syndrome—as it twice requested clarification of the trial court's

instruction of this essential element of first degree murder.

12. Battered Woman's Syndrome does not presently have a separate categorization in the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition* (DSM–IV). It is

**■ *Issues of Remoteness:*** The trial court ruled that the defendant's expert witness and eyewitnesses could not testify about the defendant's history of abuse because it was too remote to affect her reasoning, beliefs, perceptions or behavior. The trial court held that the defendant's evidence was too remote because no abuse occurred or was threatened in the hospital room, and her case was not based on self-defense.

Based solely on the passage of time, incidents of abuse in a case involving Battered Woman's Syndrome may appear to be remote and of limited relevance. However, these incidents may be essential to the jury's ability to understand the causal effect of the abuse on the defendant's reasoning or behavior. *See* Walker, L., *"The Battered Woman," supra;* and Walker, L., *"The Battered Woman Syndrome," supra* (noting that the causal effects of abuse, eventually resulting in a woman exhibiting the characteristics of Battered Woman's Syndrome, occur over a period of time that may span years).

**■** Incidents of physical or mental abuse in a battered and abused woman's life are not static. The causal effect of the abuse may occur over a period of years. Walker, *supra.* For example, a second incident of abuse in a woman's life may build upon the first incident, just as a third incident may build upon the second and first incident. It is not possible to judicially segregate incidents of abuse in a battered woman's life and say that one alleged incident is remote and inadmissible while another is relevant and admissible—all incidents, for the abused woman, may be relevant to her reasoning, beliefs, perceptions, and behavior. This is particularly so in a pretrial hearing where no evidence was presented. In our decision *In Interest of Betty J.W.,* 179 W.Va. 605, 371 S.E.2d 326 (1988), we noted:

> Men who abuse their wives classically follow [a] pattern and the family follows that pattern. A man beats his wife, makes promises and they kiss and make up, and there is a period psychologists call 'the honeymoon'. At some point following the honeymoon there is a cycle of abuse and the cycle starts all over again.

*Id.,* 179 W.Va. at 611, 371 S.E.2d at 332 (citations omitted). Where a defendant meets the requisite profile of Battered Woman's Syndrome, the causal effect of the abuse is an issue better suited for the jury.

**■** We are not saying that a trial court must allow a defendant to make a mockery of the judicial process by introducing frivolous claims. Instead, we are reaffirming that:

> An abuse of discretion is more likely to result from excluding, rather than admitting, evidence that is relevant but which is remote in point of time, place and circumstances, and that the better practice is to admit whatever matters are relevant and leave the question of their weight to the jury, unless the court can clearly see that they are too remote to be material.

*Yuncke v. Welker,* 128 W.Va. 299, 311–12, 36 S.E.2d 410, 416 (1945) (citations omitted). *See also State v. Winebarger,* 217 W.Va. 117, 124, 617 S.E.2d 467, 474 (2005) ("[w]hile remoteness in time may weaken the probative value of evidence, such remoteness does not, in and of itself, necessarily justify exclusion of the evidence.").

**■** Accordingly, we hold that in cases involving Battered Woman's Syndrome, evidence that a victim had abused the defendant may be considered by the jury when determining the factual existence of one or more of the essential elements of the crime charged, such as premeditation, malice or intent. It is generally the function of the jury to weigh the evidence of abuse and to determine whether such evidence is too remote or lacking in credibility to have affected the defendant's reasoning, beliefs, percep-

---

questionable whether an expert could "diagnose" a person with the syndrome except to the extent that it is generally:

> acknowledged as a subcategory of Post Traumatic Stress Disorder (PTSD) by experts in the field. Similar to syndromes like Rape Trauma Syndrome and Battered Child Syndrome, experts have identified significant behavioral, affective, and cognitive symptoms which make up a recognizable syndrome.

Steffani J. Saitow, Note, *Battered Woman Syndrome: Does the "Reasonable Battered Woman" Exist?,* 19 New Eng. J. On Crim. & Civ. Confinement 329, 332 n.27 (1993).

tions, or behavior at the time of the alleged offense.

*Alternative Defenses:* A final issue we address is that, in the particular fact pattern of the case before us, it is clear that the prosecution and trial court—by focusing on issues of self-defense—failed to properly consider the fact that the defendant was seeking to present an alternative defense.

In her alternative defense, the defendant wanted to introduce evidence of Battered Woman's Syndrome and her history of abuse to prove that she did not act with malice or premeditate the shooting of her husband and, therefore, that her criminal culpability was no greater than one of the lesser included offenses, *i.e.*, second degree murder or manslaughter.

■ While a defendant's presentation of alternative theories in a criminal case can be fraught with peril—particularly where they are, as in the defendant's case, inherently inconsistent—our precedent not only permits defendants to do so, but requires trial courts to give instructions for any alternative theory that the evidence supports.

> As a general rule, a criminal defendant is entitled to an instruction on any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his/her favor. Consequently, a criminal defendant may present alternative defenses even when they are inconsistent, and the mere fact that a defense may be inconsistent with an alternate defense does not justify excluding evidence related to either defense.

Syllabus Point 2, *State v. McCoy,* 219 W.Va. 130, 632 S.E.2d 70 (2006). We also noted in *McCoy* that:

> The mere "fact that [a] 'recognized defense' may be inconsistent with another defense the defendant is asserting does not justify excluding evidence and failing to give an instruction on the 'recognized defense.'" *Arcoren v. United States,* 929 F.2d 1235, 1245 (8th Cir.1991). See also *Guillard v. United States,* 596 A.2d 60, 62 (D.C.1991) ("A defendant's decision . . . to establish . . . contradictory defenses does not jeopardize the availability of a self-

defense jury instruction as long as self-defense is reasonably raised by the evidence."). It has been further noted that "[t]he rule in favor of inconsistent defenses reflects the belief of modern criminal jurisprudence that a criminal defendant should be accorded every reasonable protection in defending himself against governmental prosecution. That established policy bespeaks a healthy regard for circumscribing the Government's opportunities for invoking the criminal sanction." *United States v. Demma,* 523 F.2d 981, 985 (9th Cir. 1975).

*Id.,* 219 W.Va. at 134, 632 S.E.2d at 74.

## IV.

### Conclusion

■ The defendant was on trial for murdering her husband and facing the very real possibility that she would be imprisoned for the rest of her life. In order to convict the defendant of first degree murder, the prosecution was required to prove, beyond a reasonable doubt, that the defendant acted with malice, premeditation, and intent. The defendant was entitled to present evidence that negated, or tended to negate, one or more of those elements. For the defendant, this evidence took the form of her assertions that she had been battered and abused by her husband during her thirty-eight-years of marriage. At sentencing, even the trial court found it impossible to not comment that the defendant had been "abused throughout her life . . . by the man she killed." But it was too late; the jury had already convicted the defendant of first degree murder without hearing her mitigation evidence.

Evidence informing the jury of the defendant's history of abuse was essential to her ability to present a viable defense, and she was entitled to present this evidence through eyewitnesses and expert witnesses. In *State v. Blake,* 197 W.Va. at 705, 478 S.E.2d at 555, Justice Cleckley noted that when an "error precludes or impairs the presentation of a defendant's best means of a defense, we will usually find the error had a substantial and injurious effect on the jury."

We find that this is such a case. The trial court abused its discretion, Syllabus Point 10, *State v. Huffman, supra,* and denied the defendant her right to a fair trial, by excluding evidence that the decedent had abused her during their thirty-eight-year marriage, and that she met the requisite profile of Battered Woman's Syndrome.

■ For the reasons set forth herein, we reverse the defendant's conviction and remand this matter for a new trial consistent with this Opinion.[13]

Reversed and Remanded.

Chief Justice WORKMAN concurs and reserves the right to file a concurring opinion.

Justice McHUGH concurs and reserves the right to file a concurring opinion.

Justice DAVIS dissents and reserves the right to file a dissenting opinion.

Justice BENJAMIN dissents and reserves the right to file a dissenting opinion.

WORKMAN, C.J., concurring:

"[I]t is well established in our system of jurisprudence that regardless of a criminal defendant's status in life or the probability of guilt, he is entitled to a fair trial in accordance with the existing rules and principles of law." *State v. Kanney,* 169 W.Va. 764, 766, 289 S.E.2d 485, 487 (1982).

I write separately to emphasize one overriding point: Despite the bombast employed in the two dissenting opinions, the majority opinion in this case does nothing more than apply this Court's existing prior precedent. Quite simply, this Court has long recognized the existence of Battered Woman's Syndrome,[1] and has permitted defendants ac-

cused of killing their domestic partners to introduce evidence tending to show that they meet the profile of a battered woman. In a footnote in *State v. Riley,* 201 W.Va. 708, 500 S.E.2d 524 (1997), the Court summarized the law in this area:

> Evidence of battered spouse syndrome has been found to be admissible for a criminal defendant in West Virginia for any of three purposes. First, it can be used to determine the defendant's mental state where self-defense is asserted. *See State v. Dozier,* 163 W.Va. 192, 197–98, 255 S.E.2d 552, 555 (1979). Second, it can be used to negate criminal intent. *See State v. Lambert,* 173 W.Va. 60, 63–64, 312 S.E.2d 31, 35 (1984). Finally, in *State v. Wyatt,* 198 W.Va. 530, 482 S.E.2d 147 (1996), we discussed the potential use of the battered spouse syndrome "to establish either the lack of malice, intention, or awareness, and thus negate or tend to negate a necessary element of one or the other offenses charged." *Id.* at 542, 482 S.E.2d at 147, 159.

201 W.Va. at 714 n. 6, 500 S.E.2d at 530 n. 6.

The discussion in *Riley,* however, was rather cryptic, and was neither expounded upon nor elevated to the syllabus. *Id.* at 714, 500 S.E.2d 524 However, in 2009, this Court, *including one of the current · dissenting members,* explicitly held that such evidence is admissible in non-self-defense cases to negate a necessary element of the offense charged, such as malice or intent. In *State v. Harden,* 223 W.Va. 796, 679 S.E.2d 628 (2009), a defendant accused of murdering her husband sought to present evidence that she had been abused by her husband throughout the course of their marriage, arguing that such evidence was relevant to her state of mind at the time of the death. This Court

---

**13.** Because we have found the issues discussed dispositive, we need not address the defendant's remaining assignments of error. However, we offer guidance to the trial court on one issue that likely will remain upon remand: the admissibility of the defendant's video-taped confession to police. The prosecution sought to bar the video-taped confession on the grounds that it was self-serving, even though it was requested and taken by the police. Our review of the video shows that it is relevant to the defendant's state of mind regardless of the content of the defendant's state-

ment—the defendant is very emotional in the video and the video was made shortly after the shooting—and is admissible by the defendant for that purpose.

**1.** While the majority's use of the phrase "Battered Woman's Syndrome" is based upon well-established literature and case law, the concept should not, in any way, be limited in its application to women, but should be applied equally to all domestic partners.

held in *Harden* that, under our then-existing precedent, she was entitled to present such evidence to the jury, and the circuit court clearly erred in barring her from doing so. Then, in syllabus point four of *Harden*, the Court held: "Where it is determined that the defendant's actions were not reasonably made in self-defense, evidence that the decedent had abused or threatened the life of the defendant is nonetheless relevant and may negate or tend to negate a necessary element of the offense(s) charged, such as malice or intent." 223 W.Va. at 799, 679 S.E.2d at 631, Syl. Pt. 4. Thus, the Court clarified in a syllabus point that evidence of Battered Woman's Syndrome can be relevant *and is admissible* even in non-self-defense cases.

### Factual Misrepresentations

Not only do the dissents fail to follow the law, they also grossly misrepresent the facts of this case. First, both state that the defendant had not been abused by her husband for the last fifteen years or longer. This is completely unsupported in the record. The dissents base these misleading statements on contentions made by the prosecution in a pre-trial hearing; even though these contentions were vehemently disputed by the defense. In fact, there is *almost no evidence* in the record relating to the domestic abuse, because the trial judge excluded the defendant's witnesses who were prepared to testify about that abuse.[2] For the dissenting justices to rely on mere assertions of the prosecution (which were hotly disputed) is confounding and gravely misleading.

Furthermore, the dissents state *as a fact*, that the defendant shot her husband as a result of learning that he intended to divorce her. Justice Davis goes so far as to state that the defendant "informed the jury that she murdered her husband, not because of domestic violence, but because she was 'devastated' to know that he planned to divorce her." Again, such assertions are baseless and completely unsupported by the record. The fact is that the defendant never stated that she believed her husband planned to divorce her; rather, the dissents have drawn

an inference to meet their own needs, and are disingenuous in order to craft more persuasive dissenting opinions.

Despite the factual inaccuracies in the dissents, the facts of the instant case are not really the crux of the issue. The real issue before the Court is the application of this State's existing law to the facts. When existing law is fairly applied, the result that is reached by the majority—the reversal and remand for a new trial—is the correct outcome.

### Historical/Legal Background

By way of historical background, numerous medical and academic studies have led courts across this nation to conclude over the last few decades that a person who has been made to suffer domestic abuse—be that person a wife, a husband, a child, or a parent—can develop emotional instability and "react" to situations in a manner that we as a society would not expect of an "ordinary reasonable person." In many instances, the abused person's "reaction" manifests in the form of an injury to the person or property of their abuser, resulting in the levying of criminal charges against the abused person—sometimes very serious criminal charges. A recurring issue before this Court in reviewing criminal cases of that genre has been the relevance and admissibility of a defendant's history of abuse.

The Davis dissent, however, finding the result of such application of existing law to the instant case not a pleasant task, now takes the position (inconsistent with her opinion in *Harden* and contradictory to a long body of West Virginia law) that she only supports "the prior decisions of this Court holding that an expert may provide evidence on the battered woman's syndrome when a defendant asserts self-defense in a homicide prosecution." In *Harden*, however, the dissenting justice was in the majority that held clearly in syllabus point four that "[w]here it is determined that the defendant's actions were not reasonably made in self-defense, evidence that the decedent had abused or threatened the life of the defendant is none-

---

2. It is ironic that the Benjamin dissent bases its conclusion, in part, on the statement that "there is no evidence in the record that Stewart was abused...." Obviously, the reason that there was no such evidence is that the defense was precluded from offering it.

theless relevant and may negate or tend to negate a necessary element of the offense(s) charged, such as malice or intent." 223 W.Va. at 799, 679 S.E.2d at 631, Syl. Pt. 4.

West Virginia has been on the forefront of permitting defendants to introduce evidence of abuse occurring within a domestic relationship for more than thirty-two years. *See Dozier*, 163 W.Va. at 197–98, 255 S.E.2d at 555. We were one of the first Courts in the nation to embrace the modern scientific understanding that chronically abused persons may behave "irrationally." We emphasize "irrationally" because that term is typically measured by, or in comparison to, the judicial standard of an "ordinary reasonable person." It is clear, however, that what is rational to an "ordinary abused person"— particularly a person who has endured abuse to the extent that they meet the requisite profile of Battered Woman's Syndrome—is not the same as for someone who has not been abused.

### The Majority Decision

The instant case brings a factual scenario before the Court that is factually apposite and legally consistent with the clearly enunciated language of syllabus point four in *Harden*, as well as other prior case law in this State, insofar as it involves a defendant who seeks to introduce evidence that "the decedent had abused or threatened" her life to negate a necessary element of the charge of first degree murder. The outcome of the application may be uncomfortable given the unpleasant and dramatic facts of this case; however, existing West Virginia law permits this defendant to introduce evidence of battered woman's syndrome to negate an element of the crime with which she was charged. That is all the defendant was attempting to do.

### Not a New Defense

It should be made very clear, however, that contrary to the Davis dissent, the majority opinion does not create a new or novel "stand alone affirmative defense" based upon Battered Women's Syndrome. The relevance of a defendant's history of abuse, and evidence that a defendant meets the profile of a person with Battered Woman's Syndrome, is admissible in the instant factual context for the limited purpose of explaining to the jury the defendant's history of abuse and how that abuse may have affected the defendant's reasoning at the time of an alleged criminal act, thereby negating, or tending to negate, an essential element of the prosecution's case. *Harden*, 223 W.Va. at 799, 679 S.E.2d at 631, Syl. Pt. 4.

One of the most basic arguments a criminal defendant may raise is that the prosecution has failed to establish one of the essential elements of the crime. Here, the majority opinion simply reiterates that a defendant has the right to present evidence in an attempt to persuade a jury that one of the essential elements, such as motive, intent or premeditation, has not been proven beyond a reasonable doubt. The relevance of evidence that the defendant meets the psychological profile of Battered Woman's Syndrome is that a defendant arguably did not have the requisite mens rea to be convicted of the crime charged as a result of the changes to her psyche caused by years of domestic abuse. Since the defendant did not assert self-defense, all she can use the Battered Woman's Syndrome evidence for is to explain her state of mind, so that a jury of her peers can determine whether she had the requisite intent to have committed first degree murder; or whether she is instead guilty of a lesser degree of murder. Thus, it is completely inaccurate that the defendant as a result of the majority opinion will escape punishment.

In summary, the dissenting opinions would have this Court ignore longstanding precedent and to stray from our prior jurisprudence. As the Supreme Court of the United States stated:

The Court has said often and with great emphasis that "the doctrine of stare decisis is of fundamental importance to the rule of law." *Welch v. Texas Dept. of Highways and Public Transportation*, 483 U.S. 468, 494, 107 S.Ct. 2941, 2957, 97 L.Ed.2d 389 (1987). Although we have cautioned that "stare decisis is a principle of policy and not a mechanical formula of adherence to the latest decision," *Boys Markets, Inc. v.*

*Retail Clerks,* 398 U.S. 235, 241, 90 S.Ct. 1583, 1587, 26 L.Ed.2d 199 (1970), it is indisputable that stare decisis is a basic self-governing principle within the Judicial Branch, which is entrusted with the sensitive and difficult task of fashioning and preserving a jurisprudential system that is not based upon "an arbitrary discretion." The Federalist, No. 78, p. 490 (H. Lodge ed. 1888) (A.Hamilton). *See also Vasquez v. Hillery,* 474 U.S. 254, 265, 106 S.Ct. 617, 624, 88 L.Ed.2d 598 (1986) (stare decisis ensures that "the law will not merely change erratically" and "permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals").

*Patterson v. McLean Credit Union,* 491 U.S. 164, 172, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), *superceded in part on other grounds by* the Civil Rights Act of 1991. The Supreme Court further explained that: "any departure from the doctrine of stare decisis demands special justification." *Arizona v. Rumsey,* 467 U.S. 203, 212, 104 S.Ct. 2305, 2311, 81 L.Ed.2d 164 (1984).

Further, it is a bedrock principle of our legal system that the law must be applied fairly, consistently, and even-handedly. As judges, we cannot pick and choose which defendants we find more sympathetic and afford them greater rights than those we find particularly unsympathetic. When courts are faced with making difficult and sometimes unpopular decisions in light of hard factual situations, they cannot change the law to conform to the whim of the day. Judicial decisions are entitled to great weight and courts cannot selectively apply the law based upon the facts of a particular case. Upon a thorough review of the facts and existing law, there is no sound basis to depart from our existing law.

DAVIS, J., dissenting:

I need to make clear at the outset that I support the prior decisions of this Court holding that an expert may provide evidence on the battered woman's syndrome when a defendant asserts self-defense in a homicide prosecution. I believe such evidence is critical in domestic abuse situations where a spouse is forced to protect herself from imminent death or serious bodily injury. The facts of this case did not present an assertion of self-defense, or imminent death or serious bodily harm to the defendant.[1]

In June of 2009, the decedent in this case, Sammy Stewart, was lying in a hospital bed attempting to recover from pancreatitis. Mr. Stewart had been hospitalized for five or six days, during which time he was placed into an artificial coma and put on life support with a breathing tube. While in the hospital and in a coma, he was visited on several occasions by his wife of thirty-eight years, the defendant, Rhonda Stewart. On June 13, 2009, Mr. Stewart was awakened from his induced coma as part of his treatment. On that day, Mrs. Stewart visited Mr. Stewart. As will be discussed more fully below, during the visit Mr. Stewart informed Mrs. Stewart, in essence, that he was going to divorce her. Mrs. Stewart became extremely upset over this and left the hospital. She later returned to the hospital on the same day with a pistol. According to the testimony of an eyewitness, nurse Tara Webb, Mrs. Stewart entered Mr. Stewart's room, pointed the gun at his head and blew out his brains! At the trial, Mrs.

---

1. I wish to make clear that the trial judge did not rule definitively that Mrs. Stewart's expert could not testify at trial on the battered woman's syndrome until the expert was prepared to actually testify. Prior to the expert actually testifying, the trial court ruled on several occasions that he was amenable to allowing expert testimony of the battered woman's syndrome if the proper foundation for its admission was presented during the trial. Consistent with this ongoing tentative ruling, the trial judge made it clear that he would allow Mrs. Stewart to testify regarding any matter, including direct testimony by her of any previous domestic violence. Mrs. Stewart, however, chose to not present any testimony regarding domestic violence. To the extent that the majority opinion or any separate opinion implies that the trial court did not leave the door open on the issue of expert testimony on the battered woman's syndrome until after Mrs. Stewart testified, such implications are simply wrong. Counsel for Mrs. Stewart raised this issue after Mrs. Stewart testified and the trial judge ruled that no foundation had been laid by defense counsel that would permit introduction of the testimony by the expert, *i.e.,* there had been no evidence of self-defense and Mrs. Stewart elected to not testify about any domestic abuse that may have occurred at any point during the marriage.

Stewart testified that the gun went off by accident. In the face of these facts, the majority opinion found it reversible error to not allow Mrs. Stewart's expert, and at least two other witnesses, to present evidence of domestic abuse by the decedent, which abused occurred fifteen years prior to Mr. Stewart's murder. In view of the foregoing, I dissent.

### A. The Defendant Shot Her Husband Because He Was Going to Divorce Her

Before I address the legal merits of my dissent, I feel it is important to review some background evidence that was presented at the trial. First, it is undisputed that, during the trial, Mrs. Stewart presented one and only one defense: the shooting was an accident.[2] The following is the testimony by Mrs. Stewart regarding the shooting:

Q. Mrs. Stewart look at me please. Did you go back to that hospital to kill Sammy?

A. No. No. No. No. No. No, not him. No, not him. Not—no. No, not him.

. . . .

Q. I know it's getting very hard, but please tell the ladies and gentlemen of the jury, what happened when you got back to room nine?

A. I walked into the room. I took the gun out of my purse.

Q. What were you going to do then?

A. Oh, oh.

Q. What did you want to do?

A. I wanted—I wanted to stop the pain. I wanted to stop the pain. I wanted to stop the pain.

Q. And how were you going to stop the pain?

A. I was going to take my own life. I was—I was going to take my life. And I wanted Sam to know it. I wanted him to know.

Q. Why was it so important that Sam knew, Rhonda?

A. Oh, oh, oh. Because—because it was—it had lasted so long. It was—and it had lasted too long. It lasted too long.

. . . .

Q. Where were you standing?

A. I went—I went to his bed side. And I went to his bed side. I went—

Q. Was he awake or asleep at that moment?

A. He was sleeping.

Q. So what did you do?

A. I stepped into the bed. And I reached across him. And I nudged him. And he opened his eyes, and I was going to do this. I was going to do this, and he pulled my elbow down and pulled it down. And my—it was so fast. It was so fast. It was so fast. It was so fast. It was—there was blood. There was blood. There was blood. And I was—I needed to get help. I needed to get—I turned [and] walked. I was walking. I knew—I knew Christina was there. I knew—I knew she could help. I knew—I knew she could help. I knew she could. I knew she—

Q. Christina was a nurse?

A. Yes. Yes. Yes. Yes.

This testimony established Mrs. Stewart's defense, i.e., the gun went off accidentally when Mr. Stewart nudged her arm.

The eyewitness to the shooting, nurse Tara Webb, disputed Mrs. Stewart's version of what happened on direct and cross-examination. Nurse Webb's testimony was succinctly given on cross-examination as follows:

Q. If I am Sammy Stewart—and I know I should be laying on a bed, we're doing the best we can with the props.

Would you please step down and show the jury what you observed in terms of my client being point blank over top of him.

(The witness then stepped down.)

---

2. Contrary to assertions expressed in the majority opinion, Mrs. Stewart did not have an alternative theory of defense. The trial record is quite clear in showing that Mrs. Stewart did not assert the defense of self-defense. She did not assert the defense of diminished capacity or insanity.

In fact, her expert could not render a opinion that Mrs. Stewart suffered from diminished capacity or insanity. The only opinion that the expert could render was that Mrs. Stewart was possibly suicidal.

A. When I looked up when the monitor was ringing, I saw Rhonda standing right here with the gun to Sammy's head.

Q. When you say point blank over top of him, how was her position? Her body position?

A. She was standing right like this, with the gun to Sam's head just like this.

. . . .

Q. And then I assume you testified that you saw the act; correct?

A. Yes.

Q. Now, what did she immediately do then?

A. After the shooting, she turned around and saw me.

Q. What—

A. Saw me that I seen her shoot him.

Q. What did she say?

A. "Sorry, Sammy." Crying, "Sorry Sammy."

In the face of Mrs. Stewart's defense of accidental shooting, the State presented eye-witness testimony that the shooting was intentional. Before this Court, and during the trial, Mrs. Stewart contended that the "accidental" shooting was due to domestic violence during the early years of her thirty-eight year marriage to Mr. Stewart. This assertion was contradicted not only because she asserted the shooting was accidental; but, more importantly, because Mrs. Stewart actually testified that she killed her husband because he was going to divorce her.

During Mrs. Stewart's testimony at trial, she informed the jury that Mr. Stewart had been living alone for about three years in a camper on their property while she lived in the family home. Mrs. Stewart summarized the relationship during this period as follows:

Q. Did you or did you not continue to see Sammy during the next three years?

A. I did.

Q. How often?

A. Regularly.

Q. Would he come to your home?

A. He would. And I would cook food and take it to the camper to him.

. . . .

Q. Over the last three years, how many times per week would you say that you saw Sammy?

A. Twice maybe, maybe more. . . .

Q. Did he continue to come to visit you at the home?

A. He did.

Q. This—as odd as this scenario might sound, did you still feel that you were husband and wife?

A. I felt like I was his wife, yes.

Q. Did either of you ever file for divorce?

A. No.

This testimony established that, for about three years, Mr. Stewart refused to live in the same household with Mrs. Stewart. It also established that, during that period, Mrs. Stewart still thought of herself as a wife to Mr. Stewart. She, in fact, continued to take care of him even though he would not live with her.

Further testimony was given by Mrs. Stewart that Mr. Stewart had a girlfriend during the period that he lived in the camper. Even though Mrs. Stewart was aware of this fact, she still considered herself his wife. The following testimony by Mrs. Stewart, describing events that occurred on the day that she murdered Mr. Stewart, explains why she killed him. In this testimony, Mrs. Stewart commented on how she visited Mr. Stewart before murdering him and massaged his body:

Q. Were your visits during the regular visiting hours?

A. Yes.

Q. Rhonda, how were you feeling sitting or standing beside Sammy and rubbing his hand and feet; how were you feeling about your relationship during that time?

A. Not good. I knew—I knew there was other girls. I knew there was. Coming there.

Q. Had been other girls in his life before, hadn't there?

A. Yes.

Q. How did you always handle that?

A. He would tell me he would quit, and I would believe him.

Q. Now you made mention of it, you knew he had a girlfriend.

How long had you known he had that girlfriend?

A. Probably two years.

Q. Lasted for awhile, hadn't it?

A. Yes. Yes.

Q. In fact, who called you tell you that Sammy was in the hospital?

A. Her name is Leann Barker. Leann.

. . . .

Q. Okay. Okay, Rhonda, let's go to June 13th. Are you ready?

A. Yes.

. . . .

Q. And what was his condition on that Saturday around, I think you said one o'clock?

A. I think it was one.

Q. You think it was one. What was his condition?

A. He was off of the ventilator. And he was sitting up. And a nurse Christina was—she had come in and was taking care of something on him.

Q. Was he able to communicate with you?

A. He opened his eyes and he saw that it was me and Micky. And the nurse had her arm up over his head and was doing something to his head. And she asked him, she said, "Sam, do you know who is here?" And he said, "Yes." And he said, "It's Micky. And Rhonda Kay Boyd."

Q. What was your maiden name before you got married?

A. It was Boyd.

Q. How did you feel when he said that?

A. Oh, I knew—I knew what he meant. He had often told me that it would never be over until he said it was over.

Q. I am sorry. I didn't hear you. It wouldn't be over until what?

A. Until he said it was over. That's by him calling me my maiden name, I knew what he meant. He said it one time before.

Q. And how did you feel?

A. Devastated. I was very hurt.

Q. And then what were the words, the last words you said to Sammy before you left?

A. I told him that it was okay and that—and that Leann would be there.

The above testimony by Mrs. Stewart clearly informed the jury that she murdered her husband, not because of domestic violence, but because she was "devastated" to know that he planned to divorce her.[3] In the face of this evidence, the majority opinion contends that Mrs. Stewart should have been permitted to inform the jury that during the first few years of her marriage domestic violence may have occurred. Assuming this to be true, what relevancy did it have in this case?

### B. A Defendant May Introduce Expert Testimony Regarding the Battered Woman's Syndrome When She Asserts Self–Defense

One of the reasons given by the circuit court for excluding Mrs. Stewart's expert from presenting evidence of the battered woman's syndrome was that such evidence had relevancy only if she asserted the defense of self-defense. The trial judge found that, because Mrs. Stewart's defense alleged an accidental shooting, evidence of the battered woman's syndrome had no relevancy. The trial court's conclusion is supported by every court in the country that recognizes the battered woman's syndrome. All courts that have judicially recognized the battered woman's syndrome allow a defendant to present expert testimony on the issue *when self-defense has been asserted.* See *Ex parte Haney*, 603 So.2d 412 (Ala.1992); *People v. Humphrey*, 13 Cal.4th 1073, 56 Cal.Rptr.2d 142, 921 P.2d 1 (1996); *People v. Darbe*, 62 P.3d 1006 (Colo.App.2002); *State v. Hickson*, 630 So.2d 172 (Fla.1993); *Smith v. State*, 268 Ga. 196, 486 S.E.2d 819 (1997); *People v. Evans*, 259 Ill.App.3d 195, 197 Ill.Dec. 278, 631 N.E.2d 281 (1994); *Marley v. State*, 747 N.E.2d 1123 (Ind.2001); *State v. Price*, 2008

---

**3.** It is quite clear to me that the jury convicted Mrs. Stewart of second degree murder, instead of first degree murder, because of the reason she gave for killing her husband—she did not want to divorce him.

WL 5234351 (Iowa App.2008); *State v. Hundley*, 236 Kan. 461, 693 P.2d 475 (1985); *Springer v. Commonwealth*, 998 S.W.2d 439 (Ky.1999); *State v. Anaya*, 438 A.2d 892 (Me.1981); *State v. Smullen*, 380 Md. 233, 844 A.2d 429 (2004); *People v. Wilson*, 194 Mich.App. 599, 487 N.W.2d 822 (1992); *State v. Hennum*, 441 N.W.2d 793 (Minn.1989); *State v. Edwards*, 60 S.W.3d 602 (Mo.Ct.App. 2001); *Boykins v. State*, 116 Nev. 171, 995 P.2d 474 (2000); *State v. Kelly*, 97 N.J. 178, 478 A.2d 364 (1984); *People v. Seeley*, 186 Misc.2d 715, 720 N.Y.S.2d 315 (N.Y.Sup.Ct. 2000); *State v. Leidholm*, 334 N.W.2d 811 (N.D.1983); *Bechtel v. State*, 840 P.2d 1 (Okla.Crim.App.1992); *Commonwealth v. Miller*, 430 Pa.Super. 297, 634 A.2d 614 (1993); *State v. Urena*, 899 A.2d 1281 (R.I. 2006); *State v. Grubbs*, 353 S.C. 374, 577 S.E.2d 493 (Ct.App.2003); *Fielder v. State*, 756 S.W.2d 309 (Tex.Crim.App.1988); *State v. Hendrickson*, 81 Wash.App. 397, 914 P.2d 1194 (1996); *State v. Richardson*, 189 Wis.2d 418, 525 N.W.2d 378 (Ct.App.1994); *Witt v. State*, 892 P.2d 132 (Wyo.1995).[4] Indeed, it has been correctly noted that "battered women's syndrome is not itself a defense but, rather, is relevant in the context of self-defense." *People v. Wilcox*, 14 A.D.3d 941, 788 N.Y.S.2d 503, 505 (2005). For example, when the Ohio Supreme Court first recognized the battered woman's syndrome in *State v. Koss*, 49 Ohio St.3d 213, 551 N.E.2d 970 (1990), it held in Syllabus point 3 of the opinion:

Admission of expert testimony regarding the battered woman syndrome does not establish a new defense or justification. It is to assist the trier of fact to determine whether the defendant acted out of an honest belief that she is in imminent danger of death or great bodily harm and that the use of such force was her only means of escape.

Moreover, even when a defendant asserts self-defense, a trial court may deny expert testimony on the battered woman's syndrome when the evidence is insufficient to establish self-defense. *See People v. Hartman*, 86 A.D.3d 711, 926 N.Y.S.2d 746, 747–48 (2011) ("Defendant asserts that County Court improvidently exercised its discretion when it ruled, after she had testified, that it would not permit her to produce an expert regarding battered person syndrome. We are unpersuaded.... Here, the evidence at trial, including defendant's own testimony, undermined her claim of self-defense."); *State v. Fagan*, 2009 WL 2351753, at *4 (Ohio Ct. App.2009) ("Because Mindy failed to establish this element of self-defense, there was no need to consider testimony regarding the 'battered woman syndrome' and whether, based on that syndrome, Mindy had an honest belief that she was in danger of imminent bodily harm.").

Absent a statute to the contrary, no court in the country has allowed a defendant to introduce evidence of the battered woman's syndrome when she alleges only that the crime was an accident.[5] The courts that

---

**4.** At least one court has allowed a defendant to present expert testimony on the battered woman's syndrome when the defense is duress. *See State v. B.H.*, 183 N.J. 171, 870 A.2d 273 (2005) (allowing defendant to introduce battered woman's syndrome evidence when defense is duress). Further, at least three courts have determined that expert testimony on the battered woman's syndrome is admissible to explain a defendant's conduct in causing injury to, or neglecting the welfare of, her children. *See Mott v. Stewart*, 2002 WL 31017646 (D.Ariz.2002); *Pickle v. State*, 280 Ga.App. 821, 635 S.E.2d 197 (2006); *Barrett v. State*, 675 N.E.2d 1112 (Ind.Ct.App.1996) (superceded by statute). In *People v. Minnis*, 118 Ill.App.3d 345, 74 Ill.Dec. 179, 455 N.E.2d 209 (1983), the court held that expert testimony was admissible to help explain why the defendant dismembered her husband's body.

**5.** My research has revealed that only one state, Massachusetts, has by statute permitted evidence

of battered woman's syndrome when a defendant alleges a killing was in self-defense or accidental. The statute requires that the defendant show "the reasonableness of the defendant's apprehension that death or serious bodily injury was imminent, *the reasonableness of the defendant's belief that* he had availed himself of all available means to avoid physical combat or the reasonableness of a defendant's perception of the amount of force necessary to deal with the perceived threat." Mass. Gen. L. Ann., ch. 233 § 23F (1996). *See Commonwealth v. Pike*, 431 Mass. 212, 726 N.E.2d 940, 948 n. 9 (2000) ("The Legislature has concluded that battered woman syndrome may be the subject of expert testimony at the trial of criminal cases 'charging the use of force against another where the issue of defense of self or another, defense of duress or coercion, or accidental harm is asserted.' "). Thus, even under the Massachusetts statute Mrs. Stewart would not have been able to introduce expert

have squarely addressed this issue have unanimously agreed that expert testimony on the battered woman's syndrome is not admissible when the defendant asserts only that the crime she was charged with was committed by accident.

In *State v. Hanson*, 58 Wash.App. 504, 793 P.2d 1001 (1990), the defendant was convicted of second degree murder. On appeal, the defendant argued that the trial court committed error by excluding testimony regarding the battered woman's syndrome on the ground that she did not assert self-defense. The appellate court rejected the argument:

> The scientific basis and relevancy of such testimony in proper cases is now well established. On the facts before us, if Hanson had claimed self-defense, the testimony would have been appropriate and admissible as supportive of her apprehensions and mental state in firing the gun. However, such testimony is not supportive of the claim of accident presented here.

*Hanson*, 793 P.2d at 1003.

In *State v. Sallie*, 81 Ohio St.3d 673, 693 N.E.2d 267 (1998), the defendant was convicted of voluntary manslaughter. In her appeal, the defendant argued that she received ineffective assistance of counsel because her attorney failed to present expert testimony on the battered woman's syndrome. The appellate court rejected the argument:

> Expert testimony explaining battered woman syndrome, and opining that the defendant suffered from the syndrome, may be admitted to establish the requisite mental state in proving self-defense....
>
> In Sallie's case, trial counsel could have reasonably concluded expert testimony about battered woman syndrome was unnecessary and irrelevant. Sallie consistently maintained the shooting was accidental-that she did not intentionally pull the trigger. Testimony by the state's witnesses supported this position. Because Sallie did not claim she shot Brown in self-defense, evidence that she may have suf-

fered from battered woman syndrome was immaterial.

*Sallie*, 693 N.E.2d at 270.

In *State v. Fazio*, 1994 WL 631654 (Ohio Ct.App.1994), the defendant was convicted of murder. On appeal, one of the issues raised was that the trial court committed error in failing to appoint an expert to testify on the battered woman's syndrome. The appellate court disagreed:

> Appellant maintains that expert testimony on battered woman syndrome can be crucial when the mental state of the battered woman is at issue in a trial.
>
> [The State] argues that expert testimony about battered women syndrome was inconsistent with the defense of accident or suicide. In the present case appellant's testimony was that the shooting was accidental or that the decedent was trying to shoot himself.... Thus, testimony of an expert in battered women syndrome would be inconsistent to the facts presented here. The court did not commit plain error in failing to appoint an expert. Appellant's fifth assignment of error is without merit.

*Fazio*, 1994 WL 631654, at *4.

In *People v. Wilcox*, 14 A.D.3d 941, 788 N.Y.S.2d 503 (2005), the defendant had a group of men beat and robbed her boyfriend. The defendant was convicted of gang assault and grand larceny. On appeal, the defendant contended that the trial court committed error in not allowing her to call an expert to testify concerning the battered woman's syndrome. The appellate court rejected the argument:

> We likewise find unpersuasive defendant's contention that County Court erred in excluding expert testimony regarding battered women's syndrome. As has been observed, battered women's syndrome is not itself a defense but, rather, is relevant in the context of self-defense. As noted by County Court, the defense of self-defense was unavailable here because defendant was the initial aggressor. Accordingly, County Court properly determined that there was no basis for introduction of evi-

testimony on the battered woman's syndrome, because she was not in imminent danger of death

or serious bodily injury by Mr. Stewart at the time she murdered him.

dence concerning battered women's syndrome.

*Wilcox,* 788 N.Y.S.2d at 505. *See also People v. Varner,* 2002 WL 741531 (Mich.Ct.App.2002) (finding no error in denying expert evidence of battered woman's syndrome where defendant hired someone to attempt to kill her boyfriend).

Finally, in *Francis v. State,* 183 S.W.3d 288 (Mo.Ct.App.2005), the appellate court rejected the defendant's contention that her trial counsel was ineffective for not calling an expert to testify about the battered woman's syndrome. This argument was rejected because the defendant's theory of defense was that the victim's killing was an accident. The Court observed that "[a] claim of self-defense, supported by battered spouse syndrome, however, requires an intentional act. A claim of accident requires an unintentional act." *Francis,* 183 S.W.3d at 299.

### C. The Majority Opinion Has Made West Virginia the Only State in the Nation That Recognizes the Battered Woman's Syndrome as a Stand Alone Affirmative Defense

As I have previously mentioned, all courts in the country that have judicially recognized the battered woman's syndrome permit the defendant to present expert testimony on the issue when a defense of self-defense has been asserted. This observation by me in this dissent is not new to this Court. Justice Albright commented on this issue in his dissenting opinion in *State v. Whittaker,* 221 W.Va. 117, 650 S.E.2d 216 (2007):

> For more than twenty-five years this Court has recognized the significance of permitting a battered individual to introduce evidence about the abuse suffered "in order that the jury may fully evaluate and consider the defendant's mental state at the time of the commission of the offense." *State v. Dozier,* 163 W.Va. 192, 197, 255 S.E.2d 552, 555 (1979). Evidence adduced to demonstrate a long term abusive relationship ... is characterized as battered women's syndrome and is *typically relied upon to prove that an abused defendant acted in self defense. See State v. Wyatt,* 198 W.Va. 530, 541, 482 S.E.2d 147, 158 (1996) (recognizing that "the principal use of battered women's syndrome testimony has been in the context of self-defense);" *State v. Lambert,* 173 W.Va. 60, 63–64, 312 S.E.2d 31, 35 (1984) (noting that evidence of battered spouse syndrome "go[es] to negate criminal intent").

*Whittaker,* 221 W.Va. at 134, 650 S.E.2d at 233 (Albright, J., dissenting) (emphasis added).

What is the significance of making the battered woman's syndrome a stand-alone affirmative defense? The significance is unnerving under the facts in which this defense was created by the majority. The facts of this case show that Mr. Stewart had been living alone in a camper for three years before he was murdered by his wife. The facts show that, to the extent domestic violence occurred during the marriage, it last occurred fifteen years before Mr. Stewart was murdered.[6] The facts show that, even though Mr. Stewart lived by himself, Mrs. Stewart would still have weekly contact with him. The facts show that, while Mr. Stewart was in a hospital in an induced coma for several days, Mrs. Stewart visited him regularly and massaged his body while he laid helpless in bed. With these facts in view, the majority opinion now allows Mrs. Stewart to introduce evidence that fifteen years ago Mr.

---

6. During the trial in this case, the State pointed out that the alleged domestic violence occurred fifteen years prior to Mr. Stewart being murdered. This information was taken from the report issued by Mrs. Stewart's expert on the battered woman's syndrome. As the majority opinion noted, Mrs. Stewart strategically declined to submit the expert's report as part of the record on appeal. (I find it ironic the that majority opinion has brought utter chaos into our criminal law without ever having reviewed the report that it finds so critical). Contrary to any implications from the majority opinion or any other separate opinion, the record in this case shows that the trial judge gave counsel for Mrs. Stewart an opportunity to submit evidence to show any recent domestic violence. There was none; because, based upon what the State asserted, no recent domestic violence was reported by Mrs. Stewart to her expert when he evaluated her and found that he could not conclude that she was in fact a battered woman. Moreover, the State informed the trial judge that no criminal or civil report of domestic violence had ever been filed against Mr. Stewart by Mrs. Stewart.

Stewart argued and fought with her. The jury will be instructed that it can use this evidence to acquit Mrs. Stewart of murder or find her guilty of manslaughter or second degree murder. With this flawed reasoning, I simply cannot agree.[7]

### D. The Trial Court Correctly Read and Determined That State v. Harden Did Not Permit the Introduction of Expert Testimony on the Battered Woman's Syndrome under the Facts of this Case

Notwithstanding any implications by the majority opinion, the trial court in this case did in fact read the decision in *State v. Harden*, 223 W.Va. 796, 679 S.E.2d 628 (2009), and properly concluded that *Harden* did not permit introduction of expert testimony on the battered woman's syndrome when a defendant has not asserted the defense of self-defense. As I will show, *Harden* was decided precisely on the issue of self-defense or imperfect self-defense.

The first point that was made in *Harden* was that "[a]t trial, the defendant asserted a claim of self-defense, arguing that her actions precipitously followed a 'night of domestic terror' that ended only when the defendant shot and killed the decedent." *Harden*, 223 W.Va. at 800–01, 679 S.E.2d at 631–32. Thus, it is clear that in *Harden* the defendant raised the defense of self-defense.

The decision in *Harden* did not involve a question of whether a defendant may present evidence of the battered woman's syndrome. That is, the defendant in *Harden* did not assign as error that she was precluded from presenting any evidence of prior abuse by the decedent. The question of prior abuse became an issue only to the extent that the state argued on appeal that the defendant failed to establish sufficient evidence of self-defense.

The facts of *Harden* showed that the defendant was savagely beaten, raped and threatened by her husband until he finally went to sleep.[8] The defendant shot and killed the decedent while he was sleeping.

The state argued at trial and on appeal that the defendant failed to establish self-defense, because the victim was asleep when he was killed. To support this contention, the state relied on Syllabus point 6 of our decision in *State v. McMillion*, 104 W.Va. 1, 138 S.E. 732 (1927), where we held that:

Under his plea of self-defense, the burden of showing the imminency of the danger rests upon the defendant. No apprehension of danger previously entertained will justify the commission of the homicide; it must be an apprehension existing at the time the defendant fired the fatal shot.

The instruction given by the trial court, which was submitted by the state, tracked the language of *McMillion*. The trial court instructed the jury as follows:

In order for the Defendant to have been justified in the use of deadly force in self-defense, she must not have provoked the assault on her or have been the aggressor. Mere words, without more, do not constitute provocation or aggression. Furthermore, *you must find that the apprehension existed at the time that the defendant attacked the victim. No apprehension of danger previously entertained will justify the commission of homicide.*

*Harden*, 223 W.Va. at 802, 679 S.E.2d at 634.

The state argued in *Harden*, and correctly so, that under *McMillion* the defendant could not establish self-defense if the apprehension of death or serious bodily injury was not existing at the time the defendant used deadly force. This Court saw two problems with *McMillion*. First, that decision did not properly outline the establishment of self-defense. Second, *McMillion* did not allow for mitigation of a homicide charge when a defendant's assertion of self-defense was imperfect, yet a jury could find the defendant acted reasonably because of prior abuse. To address both of these issues, *Harden* created the following new syllabus points:

3. Where a defendant has asserted a plea of self-defense, evidence showing

---

7. There are a host of other problems that the majority opinion has injected into our criminal law as it relates to the admissibility of evidence of the character of the victim of a crime.

8. The evidence also showed that the victim threatened to kill the couples two children and a child that was visiting the home.

that the decedent had previously abused or threatened the life of the defendant is relevant evidence of the defendant's state of mind at the time deadly force was used. In determining whether the circumstances formed a reasonable basis for the defendant to believe that he or she was at imminent risk of serious bodily injury or death at the hands of the decedent, the inquiry is two-fold. First, the defendant's belief must be subjectively reasonable, which is to say that the defendant actually believed, based upon all the circumstances perceived by him or her at the time deadly force was used, that such force was necessary to prevent death or serious bodily injury. Second, the defendant's belief must be objectively reasonable when considering all of the circumstances surrounding the defendant's use of deadly force, which is to say that another person, similarly situated, could have reasonably formed the same belief. Our holding in Syllabus Point 6 of *State v. McMillion*, 104 W.Va. 1, 138 S.E. 732 (1927), is expressly overruled.

4. Where it is determined that the defendant's actions were not reasonably made in self-defense, evidence that the decedent had abused or threatened the life of the defendant is nonetheless relevant and may negate or tend to negate a necessary element of the offense(s) charged, such as malice or intent.

Syllabus point four of *Harden* was not created to allow an expert to testify regarding the battered woman's syndrome in a case where the defendant has not asserted self-defense. That syllabus point was created to allow a jury to consider and give weight to evidence of prior domestic violence that was introduced, even if the jury rejected the defendant's claim of self-defense. In the instant proceeding, the majority opinion has taken syllabus point four of *Harden*, expanded it beyond its intended application, and made the battered woman's syndrome a stand alone affirmative defense. The trial court in the instant proceeding was correct

when it found that *Harden* did not require introduction of the battered woman's syndrome in a case where self-defense was not asserted. On the contrary, a holding allowing evidenced of battered woman's syndrome in the absence of a defense of self-defense was made for the first time in the history of Anglo–American jurisprudence by the majority opinion in this appeal.

Based upon the forgoing, I dissent.

BENJAMIN, Justice, dissenting:

"If I wrong someone when not myself,
then Hamlet does it not.
Hamlet denies it. Who does it then?
His madness."

— Hamlet

The motivations for murder are seldom more apparent than in this case. On June 13, 2009, after thirty-eight years of marriage, the last three living apart, Rhonda Stewart finally understood that her marriage was over—that her hospitalized husband intended to divorce her. She was asked to leave her husband's hospital room. She did so. She drove home. She got a gun. She returned to the hospital. She parked. She walked to the Intensive Care Unit where her recently-comatose husband now lay incapacitated. She stood at his bedside and pulled the .40 caliber handgun from her purse. She woke him. He opened his eyes and focused. She put the gun to his head. She said something to him which caused his monitored vital signs to elevate dramatically, setting off alarms. And she killed him. Point blank. "Sorry, Sammy." [1]

On appeal, Rhonda Stewart becomes Hamlet, opining that she is not responsible for the death of her husband, despite an eyewitness to the execution and a confessed motive for the murder: her husband wanted to end their marriage. At trial, Rhonda Stewart said that the killing of Sammy Stewart was an accident. Not self-defense. Not fear of imminent threat. Not diminished capacity.

---

1. According to Tara Webb, who witnessed the shooting, Rhonda Stewart's words after the shooting were, "Sorry, Sammy."

Not insanity.[2] At trial, the killing wasn't her fault, it was an accident. The jury didn't buy it. On appeal the defense changed: it was not Rhonda Stewart that killed Sammy Stewart—it was something else. What was it? It was Sammy and the way he purportedly treated her decades—yes, *decades*—earlier in their marriage.

The majority opinion is based in large part on Syllabus Point 4 of *State v. Harden*, 223 W.Va. 796, 679 S.E.2d 628 (2009). In my dissent in *Harden*, I noted that *Harden's* Syllabus Point 4 was created by the majority from whole cloth with absolutely no support in the precedent of this Court (or elsewhere from what I could determine). I further explained:

> Moreover, beside having no support in our law, new Syllabus Point 4 may well have the unintended consequence of promoting vigilantism, an attempt to affect justice by one's own hand according to one's own understanding of right and wrong. . . . By placing absolutely no limit on the use of evidence of prior abusive conduct to negate an element of the crime charged, the majority unwittingly permits a defendant to claim that the most senseless murder is justified by an allegation that the decedent had wronged the defendant or posed a threat to the defendant. Until the creation of new Syllabus Point 4, such a notion was totally foreign to our jurisprudence.

> Sadly, the majority opinion disregards the progress that this State has made in recent years in the prevention, treatment, and remediation of domestic violence. Thanks to the diligence (sic) efforts of our legislature and courts, our society now works to prevent violence among family members. Spouses who find themselves in abusive or threatening situations now have resources that previous generations of abused spouses did not.

*State v. Harden*, 223 W.Va. at 817–18, 679 S.E.2d at 649–50 (Benjamin, J., dissenting).

Syllabus Point 4 of *Harden* is bad policy and bad law. Then, as now, it is a misguided leap by the majority into a jurisprudential fringe. Worse, as I predicted in my dissent, Syllabus Point 4 of *Harden* posed the potential to lead to unanticipated results.[3] This statement was prescient. In *Harden*, the defendant shot her sleeping husband in the head, killing him instantly. A majority of this Court absolved the defendant of that crime—actually ordering Harden's acquittal. In the instant case, the petitioner shot her incapacitated, though conscious, husband in the head while he was in a hospital bed, killing him. The *Harden* decision was rendered by this Court on June 4, 2009, and was widely publicized. Just ten days later, Rhonda Stewart stood by her estranged husband's bed, gun in hand.

Here, Rhonda Stewart was fairly tried by a jury of her peers who heard all of the relevant evidence. She was properly convicted of first-degree murder. The evidence was overwhelming. There was an eyewitness. There was an admission by Rhonda Stewart that she was upset because she understood that her husband intended to divorce her. There was no claim of self-defense. There was no imminent threat of death or of serious bodily harm to Rhonda Stewart. Other than alleged domestic incidents over fifteen years in the past, there was no evidence of domestic abuse. There was none in the record. There was none properly proffered.

The majority opinion also omits certain key facts that support the jury's decision to convict Rhonda Stewart of the first-degree murder of her husband. One of these witnesses was Tara Webb, a health unit coordinator for the intensive care unit who was working at the time of the shooting. Ms. Webb was the only person other than the victim and the petitioner in a position to witness the shooting. At the time of the shooting, she was seated at a desk immediately in front of Sammy Stewart's room. It was not by mere chance that she looked up to witness the shooting; she was prompted

---

2. At trial, David Clayman, Ph.D., could not render an opinion that Mrs. Stewart suffered from diminished capacity or insanity. Rather, he could only say that she was possibly suicidal.

3. *See,* Devin C. Daines, Note, *State v. Harden: Muddying the Waters of Self–Defense Law in West Virginia,* 113 W. Va. L.Rev. 971 (2011).

to look toward Mr. Stewart's room by the monitors assessing his condition. When Ms. Webb looked up at Mr. Stewart's room, she saw the petitioner standing over her husband with a gun pointed to his head. The gun itself was aimed downward. We cannot know what Rhonda Stewart was saying to Sammy Stewart, but we know that it caused his breathing and heart rates to escalate to the point that alarms sounded in the ICU. The gun then was fired, striking Mr. Stewart in the head. The wound which was caused, including its arterial element, was graphic. Sammy Stewart lay lifeless. The effect on those in the hospital that day was profound and permanent, as evidenced by their testimony.[4]

The majority discusses alternate defenses to the crime of first-degree murder; however, the petitioner did not pursue any defense other than accident. This "accident" theory of defense requires no expert corroboration

regarding whether the petitioner was the victim of spousal abuse.[5] The majority opinion states that *"this abuse could have affected the defendant's reasoning and demonstrated that she did not act with premeditation or malice."* Because there is no evidence in the record that Stewart was abused, the majority elevates speculation to hard and fast fact, and I believe this to be error.

As I stated in my dissent in *Harden*, the defense of Battered Woman's Syndrome in cases of self-defense or where there is an imminent threat of death or serious bodily harm is an important and necessary part of our jurisprudence. West Virginia has made much progress in recent years in the prevention, treatment, and remediation of domestic violence. This decision, however, takes that positive progress in a negative direction. More disturbing, it opens our courts to all forms of defenses *du jour*.[6]

4. This testimony was in sharp contrast to the testimony of the petitioner, who, for the first time at trial, testified that the reason she brought the gun to the hospital was to kill herself in her husband's hospital room so that he would know "that [she] wouldn't bother him anymore." She testified that when she returned to her husband's hospital room after going to her home to retrieve her firearm, her husband was asleep. She awakened him, ostensibly so that he could see her kill herself. According to the testimony of the petitioner, Mr. Stewart pulled down her elbow, and the gun went off. A supposed suicide note by Rhonda Stewart appeared much later. The jury had the conflicting testimony of Rhonda Stewart and Ms. Webb, and chose to believe Ms. Webb when it made its decision to convict the petitioner of first-degree murder.

5. The majority mentions in its opinion that Dr. David Clayman, a clinical and forensic psychologist with experience evaluating cases of Battered Woman's Syndrome, was retained by the defense to testify as to the petitioner's mental condition at the time she shot her husband. Dr. Clayman prepared a report which presented his findings regarding Stewart's mental state leading up to the shooting of her husband. This report was never made part of the record, and Dr. Clayman was not permitted to testify during trial as to Battered Woman's Syndrome.

While the parties did speak of Battered Woman's Syndrome during the pretrial hearing, there was no actual testimony during trial regarding Battered Woman's Syndrome. Upon the trial court's refusal to admit Dr. Clayman's report as evidence in the case, the defense made no attempt to make a proffer of what this report would contain. This Court has held that

"[t]he purpose of vouching the record is to place upon the record excluded evidence, or to show upon the record what the excluded evidence would have proved in order that the appellate court may properly evaluate the correctness of the trial court's ruling excluding it." Syllabus point 4, *State v. Rissler*, 165 W.Va. 640, 270 S.E.2d 778 (1980). Syl. pt. 5, *State v. Calloway*, 207 W.Va. 43, 528 S.E.2d 490 (1999). This Court has further held that, " '[t]he appellate review of a ruling of the circuit court is limited to the very record there made and will not take into consideration any matter which is not part of that record.' Syllabus point 2, *State v. Bosley*, 159 W.Va. 67, 218 S.E.2d 894 (1975)." Syl. pt. 6, *State v. Calloway*, 207 W.Va. 43, 528 S.E.2d 490 (1999). By failing to proffer the contents of either Dr. Clayman's report or Dr. Clayman's proposed testimony, "the record before this Court is wholly inadequate in terms of reviewing whether the circuit court acted correctly." *State v. Lockhart*, 200 W.Va. 479, 481, 490 S.E.2d 298, 301 (1997).

6. This opinion encourages such notable defenses as the "twinkie" defense (used in the defense of Dan White in the killings of San Francisco Mayor George Moscone and Supervisor Harvey Milk) and "Black Rage" syndrome (proposed in the defense of Colin Ferguson in the killing of six "white" passengers on a Long Island train). A common thread in such defenses is the tendency to search for excuses rather than responsibility for people's bad behavior. As observed above, insanity was not a claimed defense in this action. There was never a contention that Rhonda Stewart did not know right from wrong.

Here, the majority opinion sanctions the ultimate act of domestic violence. They are misguided. They substitute excuse for responsibility. Disregarding the jury, they lend legitimacy to the latest designer defense of the day—at tremendous cost to the criminal justice system. In the end, they excuse the most extreme form of violence against another human being by relieving Rhonda Stewart from the responsibility of conducting herself in a lawful manner. No matter how well-intentioned, in the final measure, they are wrong. We will never know what was said to Sammy Stewart as he knew he was about to die—what he thought as his breathing and heart rates soared, setting off the alarms on his monitors. But there is something which we should know: The answer to domestic violence is not more domestic violence.

The conviction should be affirmed. I dissent.