No. 56,244

STATE OF KANSAS, *Appellee,* v. BETTY HUNDLEY, *Appellant.*

(693 P.2d 475)

Opinion filed January 11, 1985.

*Michael L. Harris,* of Topeka, argued the cause and was on the brief for the appellant.

*Randy M. Hendershot,* assistant district attorney, argued the cause, and *Gene M. Olander,* district attorney, and *Robert T. Stephan,* attorney general, were with him on the brief for the appellee.

The opinion of the court was delivered by

HERD, J.: Betty Hundley was convicted by a jury of involuntary manslaughter, K.S.A. 1983 Supp. 21-3404, as a lesser included offense of second-degree murder, with which she was charged. The charge arose out of the shooting death of appellant's husband, Carl B. Hundley, on January 13, 1983.

The married life of Carl and Betty Hundley had been a tumultuous one. They had been married approximately ten years. During that time Carl had subjected Betty to much abuse. He had knocked out several of her teeth, broken her nose at least five times, and threatened to cut her eyeballs out and her head off. Carl had kicked Betty down the stairs on numerous occasions and had repeatedly broken her ribs.

Mrs. Hundley suffered from diabetes and, as part of his abuse, Carl prevented Betty from taking her required dosage of insulin on numerous occasions by hiding it or diluting the insulin with water. Needless to say, Betty Hundley went into diabetic comas on those occasions. In November 1982, approximately six weeks prior to Carl's death, Betty had been in the hospital for unknown causes. When she was discharged she went to live with Carl. He reacted in his usual manner by knocking her down, kicking her

and choking her into unconsciousness. This was all Carl's violence Betty could take. She moved to the Jayhawk Junior Motel. As in typical wife-beating cases, her moving did not eliminate the problem. Carl then started a pattern of constant harassment. He would call her night and day to threaten her life and those of her family. She was so frightened she started carrying a gun.

On January 13, 1983, the day of the shooting, Betty had seen Carl early in the day, at which time Carl told Betty he was going to come over and kill her. That night she heard a thumping on her motel door while she was in the bathroom. By the time Betty got out of the bathroom Carl had broken the door lock and entered the room. His entry was followed by violence. Betty was hit and choked and her life was again threatened. Carl then forced Betty to shower with him, during which time he shaved her pubic hair in a rough and violent fashion, nicking and cutting her. After that crude episode, Carl forced Betty to submit to sexual intercourse with him.

Even after that, Carl continued to threaten Betty. She was sobbing and afraid. He pounded a beer bottle on the night stand and threw a dollar bill toward the window, demanding she get him some cigarettes. Betty testified Carl had hit her with beer bottles many times in the past. Therefore, feeling threatened by the beer bottle, she went to her purse, pulled out the gun and demanded Carl leave. When he saw the gun, Carl laughed tauntingly and said, "You are dead, bitch, now!" As he reached for the beer bottle, Betty shut her eyes and fired her gun. She fired it again and again. There were five spent shells in the gun when it was seized. At the time of the shooting the deceased had his back to Betty and was paying attention to the beer bottle. She was not physically blocked from going to the door.

The autopsy revealed two gunshot wounds in the body of the deceased. It also appeared the gun had been fired from a distance greater than two feet from the body of the victim. A blood sample revealed the deceased's body had .17 alcohol content. The deceased weighed 160 pounds. Appellant testified he weighed 220 pounds.

Charles Tabor occupied the motel room next to that of appellant. He testified that some time after 7:00 p.m. he heard someone say, "You son of a bitch" followed by a succession of gunshots. He then notified the motel managers, Bill and Louise

Underwood. They called the police. Shortly thereafter, appellant came to the motel office and told Louise Underwood to call the police, that her husband had made her shoot him. Appellant was crying and walking with difficulty. Louise Underwood testified appellant had come to the motel office with her body battered and her face bruised on prior occasions.

The police testified the door to the room opened without a key, even though the lock worked properly prior to that evening. This corroborated appellant's testimony that the deceased broke his way into her room. A number of additional witnesses were called by appellant to corroborate that the deceased was violent and abusive toward appellant and had beaten her severely on innumerable occasions.

Lilly Moffett, appellant's mother, testified she had been present on numerous occasions when Carl Hundley had threatened to kill her daughter. She recalled, in particular, one night when she was visiting in the Hundley home and Carl started beating Betty. Betty begged him to stop, but he would not.

Gary Emery, a brother-in-law of appellant's, testified Carl Hundley did not just restrict his threats to Betty, but threatened other members of the family and that his threats were taken seriously.

June Patterson, appellant's sister, testified she had observed Betty after Betty had been beaten by Carl to the point where her face wounds bled profusely and required stitches. She also testified that Carl, in a moment of contrition, told her he was going to have to quit beating appellant because if he did not he would end up killing her.

Angela Bond, appellant's niece, testified she was present when appellant came to her home to hide from Carl, who was on a rampage. Carl arrived shortly thereafter, came in uninvited and dragged Betty by the hair out of the bedroom where she was hiding. He threw her down on the ground and kicked her repeatedly until the police finally arrived and took him to jail.

Troy Wilhite, appellant's nephew, lived with Carl and Betty Hundley. He stated Carl would hit and slap Betty every time he became intoxicated. Wilhite also testified he observed Carl put water into Betty's insulin bottle. When he asked Carl to explain what he was doing, Carl replied he was trying to kill Betty.

None of appellant's evidence was controverted. The State's

case was dependent upon the jury believing from appellant's evidence there was no immediate threat to appellant.

The appellant was found guilty by a jury of involuntary manslaughter, K.S.A. 1983 Supp. 21-3404. She was sentenced to a period of incarceration of not less than two years nor more than five years in prison. She appeals. The sole issue on appeal is whether the self-defense instruction given by the court correctly states Kansas law on self-defense.

Appellant argues the instruction given by the trial court was incorrect. The trial court used the standard Pattern Instructions for Kansas on self-defense which reads:

"The defendant has claimed his conduct was justified as (self-defense)(the defense of another person).

"A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's *immediate* use of unlawful force. Such justification requires both a belief on the part of defendant and the existence of facts that would persuade a reasonable person to that belief." PIK Crim. 2d 54.17. (Emphasis added.)

This instruction was derived from K.S.A. 21-3211, which states:

"A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's *imminent* use of unlawful force." (Emphasis added.)

Appellant argues the use of the word "immediate" in the PIK instruction, rather than "imminent," as stated in the statute, constitutes error since it prevented the jury from considering the evidence concerning the long-term violence of the victim toward appellant.

The defense called fifteen witnesses, other than appellant, who testified about the violent nature of the deceased and the numerous occasions on which he brutalized appellant. It is well settled in Kansas that when self-defense is asserted, evidence of the cruel and violent nature of the deceased toward the defendant is admissible, as it was in this case. See *State v. Gray*, 179 Kan. 133, 292 P.2d 698 (1956). The question is what instruction should accompany this evidence in order to charge the jury with the proper manner in which such evidence should be considered.

The State's position is the jury was properly instructed to consider the evidence by the trial court's use of Instruction 13, which stated:

"You may consider as evidence whatever is admitted in the trial as part of the record, whether it be the testimony of witnesses, an article or document marked as an exhibit, or other matter admitted . . . ."

The State further argues changing the self-defense instruction to explicitly direct the consideration of the abuse testimony would give undue emphasis to that evidence. We have held instructions are not to direct the jury's attention unduly to one isolated fact or piece of evidence. *State v. Blocker*, 211 Kan. 185, 505 P.2d 1099 (1973). Appellant argues *Blocker* was not complied with in this case because the use of the word "immediate" in the instruction required the jury to give improper emphasis to the events immediately preceding the act, rather than allowing it to consider the prior, long-term cruel and violent actions of the deceased toward appellant, which are clearly relevant to the question of self-defense.

The State argues the appellant is attempting to return to the old PIK instruction concerning self-defense. In *State v. Simon*, 231 Kan. 572, 575, 646 P.2d 1119 (1982), we disapproved the old instruction and ordered that an instruction be given as follows:

"A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force. A reasonable belief implies both a belief and the existence of facts that would persuade a reasonable man to that belief."

In changing the instruction to reflect the holding in *Simon*, the PIK committee commented that the court in the *Simon* case was "requiring the reasonableness of the defendant's belief to be measured by the objective standard of the 'reasonable man' and not by the subjective standard of the defendant's idiosyncrasies." PIK Crim. 2d 54.17, Comment.

It is not the use of the objective standard as required by this court in *Simon* that the appellant complains of. Rather, it is the substitution of the word "immediate" in the PIK instruction for the word "imminent," which was used in *Simon* as well as by the legislature in K.S.A. 21-3211. The PIK committee explained "immediate" was inserted in the self-defense instruction for

"imminent" because it is a "better understood term." PIK Crim. 2d 54.17, Comment.

As previously noted, prior abuse may be considered by the jury in determining the reasonable use of self-defense by the appellant. Thus, the question is whether the instruction allows the jury to consider "all the evidence" or whether the use of the word "immediate" rather than "imminent" precludes the jury's consideration of the prior abuse. "Immediate" is defined in Webster's Third New International Dictionary (1961): "Occurring, acting or accomplished without loss of time." p. 1129. "Imminent" is defined as: "Ready to take place . . . or impending." p. 1130. Therefore, the time limitations in the use of the word "immediate" are much stricter than those with the use of the word "imminent."

The issue is dramatized by the nature of this case. This is a textbook case of the battered wife, which is psychologically similar to hostage and prisoner of war cases. Betty Hundley had survived her husband's brutal beatings for ten years. Her bones had been broken, her teeth knocked out and repeated bruises inflicted, but she did not leave him. She called the police occasionally but would continue to stay with Carl Hundley. The mystery, as in all battered wife cases, is why she remained after the beatings. The answer to that question can only be gleaned from the compiled case histories of this malady. It is not a new phenomenon, having been recognized and justified since Old Testament times. It goes largely unreported, but is well documented. It is extremely widespread, estimated to affect between four and forty million women. See Note, *The Battered Wife's Dilemma: To Kill or To Be Killed*, 32 Hastings L.J. 895 (1981); *Identification and Treatment of Spouse Abuse, Health and Mental Health Agency Roles*, (Conference proceedings, Long Island Jewish-Hillside Medical Center; New York, New York; November 21, 1980); Hilberman, *Overview: The "Wife-Beater's Wife" Reconsidered*, 137 The American Journal of Psychiatry, No. 11:1336-1347 (1980); Fleming, Stopping Wife Abuse: A Guide to the Emotional, Psychological, and Legal Implications for the Abused Woman and Those Helping Her (1979); Dobash and Dobash, Violence Against Wives, A Case Against the Patriarchy (1979); Langley and Levy, Wife Beating: The Silent Crisis (1977); Martin, Battered Wives (1976).

Wife beating is steeped in the concept of marital privacy, and the belief wives are the personal property of the husband. In Blackstone's Commentaries the theory of coverture was advanced, making punishment for mistreatment of a wife impossible since husband and wife were considered one. 1 Blackstone, Commentaries on the Laws of England 432, 442-44 (3rd ed. 1884). Even though wife beating is now recognized as a crime in all fifty states, all the traditional attitudes have made legal and actual recognition of wife beating's criminal nature slow in coming. Even after it is recognized as a crime, it is difficult to obtain even-handed enforcement. The misconceptions have affected the battered woman's perception of herself and reduced the options available to her.

Thus, we can see from this brief synopsis that there is no easy answer to why battered women stay with their abusive husbands. Quite likely emotional and financial dependency and fear are the primary reasons for remaining in the household. They feel incapable of reaching out for help and justifiably fear reprisals from their angry husbands if they leave or call the police. The abuse is so severe, for so long a time, and the threat of great bodily harm so constant, it creates a standard mental attitude in its victims. Battered women are terror-stricken people whose mental state is distorted and bears a marked resemblance to that of a hostage or a prisoner of war. The horrible beatings they are subjected to brainwash them into believing there is nothing they can do. They live in constant fear of another eruption of violence. They become disturbed persons from the torture.

Under the facts of this case, after ten years of abuse, Betty finally became so desperate in her terror of Carl she fled. Her escape was to no avail; he followed her. Her fear was justified. He broke through the locked door of her motel room and started his abuse again. Carl's threat was no less life-threatening with him sitting in the motel room tauntingly playing with his beer bottle than if he were advancing toward her. The objective test is how a reasonably prudent battered wife would perceive Carl's demeanor. Expert testimony is admissible to prove the nature and effect of wife-beating just as it is admissible to prove the standard mental state of hostages, prisoners of war, and others under long-term life-threatening conditions. Thus, we can see the use of the word "immediate" in the instruction on self-

defense places undue emphasis on the immediate action of the deceased, and obliterates the nature of the buildup of terror and fear which had been systematically created over a long period of time. "Imminent" describes the situation more accurately.

Appellant aptly makes the following analogy under a more normal situation which further demonstrates the difference in the definitions of "imminent" and "immediate." An aggressor who is customarily armed and gets involved in a fight may present an imminent danger, justifying the use of force in self-defense, even though the aggressor is unarmed on the occasion. There may be no immediate danger, since the aggressor is in fact unarmed, but there is a reasonable apprehension of danger. In other words, the law of self-defense recognizes one may reasonably fear danger but be mistaken. See *State v. Reed*, 53 Kan. 767, 37 Pac. 174 (1894).

The question as to the use of the word "immediate" was addressed by the Washington Supreme Court in *State v. Wanrow*, 88 Wash. 2d 221, 559 P.2d 548 (1977). There the court stated: " 'It is clear the jury is entitled to consider *all* of the circumstances surrounding the incident in determining whether [the] defendant had reasonable grounds to believe grievous bodily harm was about to be inflicted.' " 88 Wash. 2d at 236. The court held the instruction given by the trial court which narrowed the focus of inquiry to the time immediately before the shooting was impermissible since it restricted the jury's inquiry into the surrounding circumstances. The *Wanrow* court noted the crucial importance knowledge of violent reputation plays in determining what degree of force is reasonable in self-defense.

The circumstances of the instant case are quite similar to those in *Wanrow*. In that case the woman was intimately familiar with the man's past history of violent attacks; the police had been called in on previous occasions but had failed to resolve the situation; the size difference between the woman attempting to defend herself and her attacker was held to be significant; and the attacker was intoxicated. All of these factors were discussed as influencing the woman's perception of her limited options and need to use self-defense. Each of these factors was also in existence in the instant case.

In *People v. Torres*, 94 Cal. App. 2d 146, 210 P.2d 324 (1949), the California Court of Appeals found reversible error in the

refusal to give an additional instruction telling the jury to consider the previous threats made by the victim to the defendant, coupled with the use of the word "immediate" in the self-defense instruction, since together these detracted from the jury's consideration of the history of the relationship between the defendant and victim. The California court ruled that the relationship must be considered in evaluating the perception of the situation and the response thereto. The court noted that a person who had been threatened or beaten by an individual is justified in acting more quickly and in taking harsher measures for protection than would another who had not received such threats.

We conclude the trial court's use of PIK Crim. 2d 54.17, which departed from the statutory language, impermissibly excluded from the jury's consideration the effect on the appellant of the history of violence toward her by the decedent. This consideration was critical to the appellant's perception of the need to defend herself in this case and thereby caused reversible error.

The judgment of the trial court is reversed and this case is remanded for a new trial.

McFarland, J., dissenting: There can be no doubt from the evidence that the deceased was a violent, brutal man who had repeatedly attacked and injured his wife over a number of years. I am concerned, however, that the majority opinion is an example of the old adage that harsh facts make bad law.

Black's Law Dictionary 675-76 (5th ed. 1979) contains the following definitions:

"**IMMEDIATE**. Present; at once; without delay; not deferred by any interval of time. In this sense, the word, without any very precise signification, denotes that action is or must be taken either instantly or without any considerable loss of time."

"**IMMINENT**. Near at hand; mediate rather than immediate; close rather than touching; impending; on the point of happening; threatening; menacing; perilous."

"**IMMINENT DANGER**. In relation to homicide in self-defense, this term means immediate danger, such as must be instantly met, such as cannot be guarded against by calling for the assistance of others or the protection of the law. Or, as otherwise defined, such an appearance of threatened and impending injury as would put a reasonable and prudent man to his instant defense."

There is a fine distinction between "immediate" and "immi-

nent." Probably it would be better to utilize the statutory term "imminent" rather than "immediate" in a self-defense instruction. In a factual situation involving matters of seconds the distinction could be significant and the use of "immediate" could constitute reversible error. An example of such situation would be two men arguing in the middle of a parking lot. One man sees the other reach for the door of his automobile while stating he is going to kill him and he knows the man has a gun or a knife therein. The danger in such circumstances may be imminent but not immediate. But the facts before us do not show imminent or immediate danger of harm.

There were only two persons in the motel room. One admits killing the other. The only version of what transpired is that of the defendant herein. Taking this as true, the deceased told the defendant to leave the premises, giving her money to buy cigarettes. The deceased then sat on the bed in his shorts, not even looking in the defendant's direction. The defendant reached for her purse by the door, took a gun therefrom and fired five shots at the deceased. The parties were in a motel room in a busy part of the city of Topeka in the early evening hours. They were not in some remote area where help would be difficult to obtain. At the very least, defendant would have had a five-minute head start on the defendant had she failed to return with the cigarettes. I fail to see how, in this factual situation, it could be reversible error to use "immediate" rather than "imminent" in the self-defense instruction as it would not have altered the outcome.

I would affirm the trial court.