NOT DESIGNATED FOR PUBLICATION

No. 116,029

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ASHLEY JEANETTE DAKE,
*Appellant*.

MEMORANDUM OPINION

Appeal from Harvey District Court; WILLIAM F. LYLE JR., judge. Opinion filed October 13, 2017. Affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*David E. Yoder*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., MCANANY, J., and HEBERT, S.J.

PER CURIAM: Ashley Dake appeals her convictions of criminal threat, interference with law enforcement by obstructing official duty, and two counts of aggravated assault on a law enforcement officer. She claims the evidence at trial was insufficient to support her convictions and that the court improperly instructed the jury on the applicable law.

Dake's convictions arose out of an incident in May 2014, which began when she called 911 and threatened to kill someone. The 911 operator dispatched sheriff deputies to Dake's home and informed them that there was an armed female who was threatening to kill someone. Dake then called back and reported that while she was armed with a

pistol, it was in a holster and she did not intend to shoot anyone. But this apparently was after Sheriff Deputies Tim Boese and Carmen Clark were on their way.

Boese arrived first at Dake's home. Clark arrived shortly thereafter as backup. They parked on the road quite some distance from the home, where they observed Dake pacing around on the front porch with a gun in her hand.

Boese yelled at Dake to come to them unarmed, but she came off the porch and began approaching with the gun still in hand. Boese told Dake to stop and put down the gun. Dake refused to drop the gun. She began cursing at the deputies. Dake had her finger on the holster of the gun in the same position where the trigger was located, but she did not point the gun directly at the deputies. Clark could see that the gun was in its holster and that the holster strap was undone. Boese could not see the holster and believed that Dake had her finger near the trigger. Boese was worried that he would have to use his weapon if Dake did not stop. Clark believed that he and Boese could be struck if Dake began firing.

Boese finally coaxed Dake to stop, but she did not drop the gun. She squatted down and held the gun between her knees and began concentrating on the ground in front of her. Boese believed Dake was stressed to the point that she was going to have to choose whether to surrender or fight. He was worried that he was either going to have to shoot Dake or that she was going to start shooting at them. Boese ordered Dake to drop the gun and step away from it, which she finally did. Boese and Clark then took Dake into custody.

When Clark secured the gun, Boese saw that the gun was in a holster and the strap for the holster was unhooked. Dake told Clark that she wanted to kill Judge Joe Dickinson and Gloria Arellano of the police department regarding a child custody dispute.

The following day Officer Shawn Chapman interviewed Dake, and she told Chapman that she had told Clark that she wanted to kill Judge Dickinson and Arellano. She further explained why she was mad at each person.

At trial, the district court instructed the jury that aggravated assault on a law enforcement officer required proof that Dake used a deadly weapon to knowingly place uniformed or properly identified deputies in reasonable apprehension of immediate bodily harm while they were engaged in the performance of their official duties on the date in question in Harvey County, Kansas. (Separate but otherwise identical instructions were given for the charge related to Clark and the charge related to Boese.)

The jury found Dake guilty as noted earlier, and Dake was granted probation for 24 months with an underlying 38-month prison sentence. Dake's appeal brings the matter to us.

*Sufficiency of the Evidence of Aggravated Assault*

Dake argues the evidence at trial was insufficient to find her guilty of aggravated assault on a law enforcement officer because the State failed to prove the officers had a reasonable apprehension of *immediate* bodily harm. Because of the steps she would have had to take to discharge her weapon, she argues that the threat to the deputies may have met the more generous standard of being "imminent" but not the more restrictive standard of being "immediate." She relies on our Supreme Court's opinion in *State v. Hundley*, 236 Kan. 461, 693 P.2d 475 (1985), for support.

In considering this claim, we examine the evidence in the light favoring the State to determine whether a rational fact-finder could have found Dake guilty beyond a reasonable doubt based on the evidence at trial. See *State v Laborde*, 303 Kan. 1, 6, 360 P.3d 1080 (2015). In doing so, we do not reweigh the evidence or the credibility of

3

witnesses. *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016). But we are permitted to consider reasonable inferences arising from the facts. *State v. Herndon*, 52 Kan. App. 2d 857, 862, 379 P.3d 403 (2016), *petition for rev. filed* August 15, 2016. Even verdicts based wholly on circumstantial evidence will not be overturned so long as the evidence provides a reasonable basis for a fact-finder to find guilt beyond a reasonable doubt. See *State v. Logsdon*, 304 Kan. 3, 25-26, 371 P.3d 836 (2016).

The immediacy of anticipated harm was found in *State v. Brown*, No. 114,808, 2016 WL 7429424, at *4 (Kan. App. 2016) (unpublished opinion), *petition for rev. filed* January 18, 2017, when the knife-wielding defendant was advancing and less than 5 feet from the victim because "an armed aggressor advancing with a weapon . . . does in fact present an immediate threat."

In *State v. Eichman*, 26 Kan. App. 2d 527, 531-32, 989 P.2d 795 (1999), the immediacy requirement was satisfied when the defendant raised his hand from the center console of his truck holding a pistol, though he did not point it at the officers. The jury could infer from this conduct that the defendant exhibited the gun in order to make the officers fear immediate bodily harm.

With respect to Deputy Boese, he arrived at the scene knowing that Dake was armed, angry, upset, and harbored the intent to kill someone. Boese confirmed that Dake was angry and upset from the manner in which she paced around her front porch. He could see she was armed, though he did not immediately see the holster. Her index finger appeared to be on the trigger. He ordered her to stop and drop the weapon, to which she did not immediately respond. Her anger was addressed to the deputies at the time, as she cursed them while she waived the gun around. When she squatted down with the gun between her knees, Boese thought she might charge at him and shoot him.

4

Viewing this testimony and the reasonable inferences arising from this testimony in the light favoring the State, a reasonable juror would conclude that an angry and upset Dake, advancing with her index finger on the trigger of a handgun, placed Boese in reasonable apprehension of immediate bodily harm.

With respect to Deputy Clark, the only difference was that Clark could see that Dake's handgun was in a holster with the strap unbuttoned. But he could see Dake's trigger finger poised over the trigger guard, and he feared that Dake could draw the gun from its holster and fire at them quite rapidly. Further, he could see that Dake was close enough that if she fired she could have hit him. Like Boese, Clark knew Dake was angry and upset and had threatened to kill someone. Under these circumstances, viewing the evidence in the light favoring the State, the evidence was sufficient to support a finding that Dake presented an immediate threat of bodily harm to Clark.

As noted earlier, in *Hundley*, 236 Kan. at 469-70 (McFarland, J., dissenting), our Supreme Court recognized a substantive distinction between the adjectives "immediate" and "imminent." Dake asserts the State and its witnesses used the word "imminent" throughout the trial and, therefore, the State has failed to prove the "immediate" element of an assault.

It is interesting to note that Dake's counsel used the word *imminent* throughout trial to describe the immediacy of the threatened harm, thereby inviting the use of this adjective. A party may not invite error and then complain of it on appeal. *State v. Verser*, 299 Kan. 776, 784, 326 P.3d 1046 (2014). Besides, *Hundley* does not control here. *Immediate* is the proper adjective that applies to the deputies' apprehension of bodily harm. The court instructed the jury that the State had to prove the threatened harm was immediate, not imminent. The jury applied the instructions' requirement of immediacy rather than imminence to the testimony of Boese and Clark and found that the apprehension they experienced was of immediate bodily harm. There was substantial

5

competent evidence to support this finding of immediacy and to support Dake's convictions for aggravated assault on a law enforcement officer.

*Sufficiency of the Evidence of Obstruction*

Next, Dake argues that the evidence at trial was insufficient to find her guilty of interference with law enforcement officers by obstructing them in doing their official duty because (1) the officers were not substantially hindered in completing their duty and (2) her actions did not increase the burden on the officers.

When the sufficiency of the evidence is challenged in a criminal case, we apply the same test discussed earlier in this opinion.

Even verdicts based wholly on circumstantial evidence will not be overturned so long as the evidence provides a reasonable basis for a fact-finder to find guilt beyond a reasonable doubt. *Logsdon*, 304 Kan. at 25.

Under K.S.A. 2016 Supp. 21-5904(a)(3), a finding of guilt on this charge requires the State to prove beyond a reasonable doubt that the defendant knowingly obstructed, resisted, or opposed any person authorized by law in the discharge of any official duty. In addition to these statutory elements of the crime, our caselaw requires the State to prove that the defendant "'substantially hindered or increased the burden of the officer in carrying out his official duty.'" *State v. Brown*, 305 Kan. 674, 690, 387 P.3d 835 (2017) (quoting *State v. Parker*, 236 Kan. 353, 364, 690 P.2d 1353 [1984]).

Whether the defendant has obstructed an officer's exercise of an official duty depends on the facts of each case. *Parker*, 236 Kan. at 364-65. The courts have interpreted the obstruction element, and thus the substantial hindrance or increasing the burden on the officer element, quite broadly. *State v. Lee*, 242 Kan. 38, 40-41, 744 P.2d

6

845 (1987) (recognizing that "[a]t common law, obstruction included *any* act which impeded justice"); *Parker*, 236 Kan. at 364-65 (recognizing that words alone could constitute obstruction); *State v. Latimer*, 9 Kan. App. 2d 728, 733, 687 P.2d 648 (1984) (recognizing that providing false information in course of a criminal investigation can constitute obstruction). In *Brown*, 305 Kan. at 690, the court recognized that

> "'[t]he principal purpose of criminalizing conduct that resists and obstructs officers in the performance of their duty is to protect officers from physical harm . . . . The statutes de-escalate the potential for violence which exists whenever a police officer encounters an individual in the line of duty, and the concern is not limited to the officer's safety but extends to all parties involved, including the prospective arrestee.' [Citation omitted.]"

In *Brown*, 305 Kan. at 691, the court held that the defendant substantially increased the burden on the officers when he failed to comply with an officer's request to come out of the home, thereby increasing the safety issue for the officers and delaying the officers in making the arrest by 5 or 10 minutes. The court noted that "the officers had to engage in additional actions to address the heightened safety concerns." 305 Kan. at 691.

In *State v. Everest*, 45 Kan. App. 2d 923, 929-30, 256 P.3d 923 (2011), a three-minute delay caused by the defendant giving a false name was insufficient to support a conviction for interference with a law enforcement officer by obstruction of official duty. Under *Everest*, a short temporal delay is not enough. There must be an actual increase in the threat or additional actions that the officer must take as a result of the defendant's conduct.

Here, viewing the facts in the light favoring the State, Dake failed to comply with Boese's order to stop and put down the gun. Dake's failure to comply with this order required Boese to engage in additional action to address the heightened safety concerns caused by the armed and upset Dake approaching the deputies. Boese had to tell Dake again and again to stop and put down the gun and to make plans for what was going to

7

happen if she did not put down the gun and continued to approach the officers. As found in *Brown*, increasing the safety concern for the officer and making him plan for the additional safety concern can be enough to find obstruction of official duty. Further, the duration of the delay was consistent with that found to be sufficient in *Brown*.

There was sufficient evidence to support Dake's conviction for interference with law enforcement officers by obstructing them in doing their official duty.

*Multiplicity*

Dake argues that the prosecution presented evidence of multiple acts, any one of which individual jurors could have relied upon in finding her guilty of criminal threat. She further argues the district court could have protected against this by giving the jury a unanimity instruction, but it failed to do so.

Convicting Dake for making a criminal threat required proof that she made a threat to commit violence and communicated it with the intent to place another person in fear or with a reckless disregard of the risk of causing fear. See K.S.A. 2016 Supp. 21-5415(a)(1).

Dake contends that the district court should have given a unanimity instruction to avoid jury confusion because the State produced evidence at trial of multiple acts that could have constituted criminal threat. Dake contends that the jury could have found criminal threat for her conversation with the 911 dispatcher that occurred over the phone, for her conversation with Clark and Boese that occurred in the field, or for her conversation with Shawn Chapman that occurred at the police station the following day. Dake also argues that the State never clearly elected which act it was charging for the crime, and the State discussed all of the different acts during its closing arguments.

8

"When a case involved multiple acts, the jury must be unanimous in finding which specific act constitutes the crime." *State v. King*, 297 Kan. 955, 977, 305 P.3d 641 (2013). When the party does not request a unanimity instruction at trial but raises the issue for the first time on appeal, as is the case here, we use the clear error standard of review. See K.S.A. 2016 Supp. 22-3414(3). *King* provides the detailed steps we must take in reviewing the trial court's failure to give a unanimity instruction.

Whether there were multiple acts is a question of law over which we have unlimited review. 297 Kan. at 981. Multiple acts are found when several acts are alleged and any one of them could constitute the crime charged. Multiple acts are found when the incidents in question are separate and distinct from one another and not part of a single continuous course of conduct. When determining whether defendant's acts are a single course of conduct the court generally considers the following factors: (1) the temporal proximity of the acts, (2) the location where the acts occurred, (3) the causal relationship between the acts and if there were any intervening circumstances, and (4) whether there was a fresh impulse that motivated the additional acts. 297 Kan. at 981.

The fact that there were multiple potential victims does not make this a multiple acts case. Here, Dake's threat was directed at the same victims in each instance, namely Judge Dickinson and Arellano. Dake originally threatened that she was going to kill someone and later identified that someone as Judge Dickinson and Arellano. The mere fact that there were multiple victims of the same threat does not mean that the threat was more than one act for which a unanimity instruction should have been given. *State v. Williams*, 303 Kan. 750, 755-56, 368 P.3d 1065 (2016).

Dake thought Judge Dickinson and Arellano had wronged her by taking away her children and by failing to give her the information she requested, so she threatened to kill them. The stimuli for the threats against Judge Dickinson and Arellano did not change. Her later explanation of the individuals against whom her threat was directed did not

constitute a separate instance upon which a conviction could be based. The court did not need to give a unanimity instruction if the jury could not have found Dake guilty of the crime for each individual act. See *State v. Bourbon*, No. 103,910, 2011 WL 2135157, at *3-4 (Kan. App. 2011) (unpublished opinion).

The expression of Dake's threat to kill Judge Dickinson and Arellano was a single continuous act with no intervening circumstance or fresh impulse that prompted a new threat. There was no need for the district court to issue a unanimity instruction.

*Lack of an Instruction Defining "Immediate"*

Dake argues that the jury should have been instructed on the definition of the word "immediate" as used in setting forth the elements of the crime of aggravated assault on a law enforcement officer and that the trial court's failure to give the instruction was clear error.

When a party fails to object to the jury instructions or fails to request the jury instruction, as is the case here, we may reverse only upon a showing of clear error. K.S.A. 2016 Supp. 22-3414(3). Our review of this issue is unlimited. *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014). To establish clear error, "'the defendant must firmly convince the appellate court that the giving of the instruction would have made a difference in the verdict.' [Citation omitted.]" *State v. Cooper*, 303 Kan. 764, 771, 366 P.3d 232 (2016).

Dake argues that under *Hundley* there is a distinction between a consequence being immediate and a consequence being imminent. She argues that the time period for an immediate consequence is much shorter than the more relaxed time period for an imminent consequence, thus requiring a definition for the jury of "immediate," the term used in the aggravated assault on a law enforcement officer statute. Dake contends that

10

the definition of immediate must include the phrase "without any considerable loss of time."

Defining the word "immediate" for the jury would not have changed the outcome of this case. Dake was close enough to Clark and Boese that she could have shot them without any considerable loss of time. Dake held the gun in her hand. The gun was in an unfastened holster. Dake could have easily taken the gun out of the holster and discharged it at Clark and Boese without any considerable loss of time. Failing to instruct the jury on the definition of "immediate" was not clear error.

Affirmed.