NOT DESIGNATED FOR PUBLICATION

No. 122,178

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MITCHELL R. ELLIOTT,
*Appellant*.

MEMORANDUM OPINION

Appeal from Clay District Court; WILLIAM M. MALCOLM, magistrate judge. Opinion filed June 26, 2020. Affirmed.

*Chris Biggs*, of Knopp and Biggs, P.A., of Manhattan, for appellant.

*Richard E. James*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., GREEN, J., and TIMOTHY J. CHAMBERS, District Judge, assigned.

PER CURIAM: T.K., a 12-year-old boy, and his mother, M.K. (mother), erupted into an argument in the kitchen of their home. During the argument T.K. abruptly left the kitchen table, and his mother told him to return to the table so they could finish their conversation. T.K. refused and continued to walk away when his mother attempted to grab him and sit him back down at the table. T.K. resisted his mother's attempt to sit him down at the table, forcing her to step backwards. Mitchell Elliott, the mother's boyfriend, saw what had occurred between the mother and T.K. He then had a brief altercation with T.K. The details surrounding what occurred between T.K. and Elliott varied, but Elliott was later charged with misdemeanor battery.

1

Elliott was found guilty after a bench trial. On appeal, Elliott argues that the trial court improperly considered his affirmative defense of parental discipline and applied an incorrect standard to his defense of another claim. Elliott fails to show that the trial court improperly considered his parental discipline defense. Likewise, he fails to show that the trial court applied an improper standard to his defense of another claim. Accordingly, we affirm.

On August 26, 2018, T.K., his mother, his two younger brothers, L.K. and D.K., and Elliott were all together at home. Around dinner time, T.K., his mother, and Elliott were sitting at the kitchen table when T.K. and his mother got into an argument about her divorce from T.K.'s father and T.K. spending time at his father's house.

During the argument, T.K. got upset, stood up, and started to walk away. His mother told him to come back and sit down at the table, but he ignored her request. Then the mother attempted to grab T.K. to force him to sit back down at the kitchen table. But when T.K. pulled his arms away, it caused her to step back. Elliott then intervened between the two of them. Yet, as detailed later at trial, the testimony varies about what happened next.

While all this was happening, L.K. was in the living room, which was next to the kitchen, and D.K. was downstairs in his bedroom. L.K. who was approximately 12 feet away, could see T.K. and Elliott from the living room but could not see his mother. These events frightened L.K., so he ran to his and T.K.'s father's house. L.K. returned shortly with his father, and T.K. left the house with his father. The next day T.K. and his father went to the police.

Mark Dunn, a deputy sheriff with the Clay County Sheriff's Department, drove to T.K.'s father's house to interview T.K. and L.K. After interviewing T.K. and L.K., Deputy Dunn went to mother's house to interview her and Elliott.

The State later charged Elliott with misdemeanor battery against T.K. in violation of K.S.A. 2018 Supp. 21-5413(a)(1). Elliott elected to have a trial before a judge.

At trial, T.K. testified that after his mother attempted to grab him by his shoulders, he pulled his arms away, causing her to step back. Next, he testified that Elliott came from behind T.K. and put T.K.'s face into the wall. Elliott then put T.K. on his back on the floor, put his hand to T.K.'s throat, and according to T.K., stated: "[D]on't touch your mother—don't put your hands on your mother like that." T.K. estimated that Elliott was on top of him for about seven seconds before allowing T.K. to get up. T.K. and his mother then finished their discussion.

L.K. testified that he heard T.K. arguing with their mother and he saw T.K. pull away from her. He stated that he also saw Elliott put T.K.'s face into the corner and then put T.K. on the floor. Nevertheless, Elliott, who also testified at trial, denied that L.K. was able to see what took place because his line of sight would have been obstructed by walls. In closing arguments, Elliott's attorney maintained that L.K. was trying to make his father happy with his testimony.

Deputy Dunn testified that T.K. told him that he and his mother were having an argument because she believed he was causing problems between T.K.'s father and her. Deputy Dunn stated that T.K. told him that Elliott stepped in between him and his mother and "put him on the floor." L.K. also told Deputy Dunn that he saw Elliott "put [T.K.] on the floor." When T.K. originally spoke with Deputy Dunn, T.K. did not tell him that Elliott shoved him into a wall or beat him in any fashion.

3

The mother also testified that after T.K. got up from the table during their argument, she told T.K. to sit back down or she would make him sit back down. She stated that T.K. told her to make him, so she grabbed his shoulders to place T.K. back in the chair. She then said that T.K. pushed her and she went backwards into a door but did not fall to the floor. Elliott then "grabbed [T.K.], pivoted, and sat [T.K.] on his bottom."

The mother recalled seeing T.K.'s lip bleeding, and she testified that he looked traumatized by what had happened. But she did not recall seeing T.K.'s face pushed into the wall. She also stated that T.K.'s back was never on the floor, Elliott was never on top of T.K., and T.K.'s face was never on the floor. When asked about how T.K. busted his lip, she stated she thought he bit it, but she was unable to say definitively how it happened. She estimated that less than 15 seconds elapsed from when T.K. pushed her until Elliott sat T.K. down.

At trial, the State introduced photographs that showed marks on T.K.'s neck, a bruise on his elbow, a mark on his right shoulder blade, a scratch going down his back, a mark on his lower back, and a swollen and busted lip.

Elliott testified that he was in the kitchen with the mother and T.K., but he was not paying attention to their conversation until their voices escalated. Elliott said that after the mother tried to get T.K. to sit back down in his chair, T.K. "exploded into a rage" and grabbed his mother and "slid her across the floor into the corner[.]" Elliott stated that the mother screamed when T.K. pushed her. When asked how he responded, Elliott stated:

> "I believe that I grabbed the young man, he would have been facing away from me, I believe I grabbed him by the—would be his left shoulder, spun him around back to me, and then I would have grabbed him—if you want to say neck or throat, it was in this area, it was. I sat him on the ground in that little corner right on his butt."

4

Elliott stated that he was just trying to get T.K. off his mother. And he denied ever pushing T.K.'s face into the wall or putting T.K. on his back on the floor. Elliott then explained how the bruises T.K. sustained to his shoulder blades were consistent with his version of the events, but Elliott was not able explain the horizontal marks on T.K.'s back just above his waistband.

When Deputy Dunn testified about what the mother and Elliott had told him in his original interview, Deputy Dunn stated that Elliott had told him that T.K. had pushed his mother, causing her to stumble, and that was why Elliott stepped in and "put [T.K.] on the floor." In the written statement he provided to Deputy Dunn, Elliott stated that T.K. had knocked his mother to the floor. The mother also told Deputy Dunn that T.K. had pushed her, but Elliott was the only person who told Deputy Dunn that the mother had fallen to the floor.

The judge found Elliott guilty of misdemeanor battery and sentenced him to 50 days in jail—which he had already served—and payment of costs.

Elliott timely appeals to this court.

*Did the Trial Judge Properly Consider Elliott's Parental Discipline Defense?*

Elliott argues that the trial judge improperly applied the facts of the case to his parental discipline defense. Specifically, Elliott argues that the trial judge disallowed the parental discipline defense because he claims the trial judge ruled that the "defense did not apply to someone not married to the mother of the child but whom the child respected as an authority figure in the home."

In response, the State argues that the trial judge never ruled that "the parental discipline defense did not apply because the Defendant was not married to the mother."

5

Instead, the State contends that the trial judge "allowed the Defendant to make a parental discipline defense, but the trial court simply rejected it under the facts of the case." The State believes the trial judge found "the level of force inappropriate for the situation."

The parental discipline defense was described by this court in the following way: "In Kansas, the affirmative defense of parental discipline is based on an objective standard. It is a defense to the charge of battery if a parent's use of physical force upon a child was reasonable and appropriate and with the purpose of safeguarding the child's welfare or maintaining discipline." *State v. Wade*, 45 Kan. App. 2d 128, 139, 245 P.3d 1083 (2010). This court also held that parental discipline was a common-law defense that our Supreme Court had tacitly recognized in *State v. Severns*, 158 Kan. 453, 459, 148 P.2d 488 (1944). *Wade*, 45 Kan. App. 2d at 137.

Both parties agree that whether the trial judge rejected the defense is a question of law over which this court has unlimited review. But neither party cites applicable authority for the contention that we have unlimited review. The question before us is whether the parental discipline defense provided Elliott a defense against the misdemeanor battery charge. For example, in Elliott arguing for the application of the parental discipline defense, some questions would be relevant: (1) Was the use of physical force against the child reasonable and appropriate? (2) What, if any, injuries were sustained by the child? and (3) Was the physical force used necessary to safeguard the child's welfare or maintain discipline? These questions are the basic fact components of the ultimate fact: parental discipline defense. Thus, our review of this ultimate fact would require a determination of a mixed question of fact and law.

When reviewing a mixed question of fact and law, an appellate court applies a bifurcated review standard. The appellate court generally reviews the factual findings under the substantial competent evidence standard. It has unlimited review of the conclusions of law based on those facts. See *State v. Johnson*, 304 Kan. 924, 950, 376

6

P.3d 70 (2016). Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *State v. Doelz,* 309 Kan. 133, 138, 432 P.3d 669 (2019).

Elliott maintains that parental discipline is an affirmative defense available to nonbiological parents. The State does not dispute this contention. This court has also held that it was not error to give the jury a parental discipline instruction in a case where a boyfriend was accused of battery against his girlfriend's child when the boyfriend was not the child's biological father. See *State v. McDuffie*, No. 106,528, 2012 WL 3136492, at *1-4 (Kan. App. 2012) (unpublished opinion). Thus, this court has allowed the defense in a factual situation similar to this one.

When Elliott argued the defense during closing arguments, the following exchange occurred:

> "State versus Wade 45 Kan.App.2d 128 tells us that a parent can inflict corporal punishment, there's nothing against corporal punishment, so long as it is reasonable use of force and appropriate with the purpose of either safe guiding the child—safeguarding the child's welfare or maintaining discipline.
> "Now, I'm not trying to tell you that Mr. Elliot is the parent—
> "THE COURT: Good, he's not.
> "MS. JORDAN: —but he has stepped—I agree. He'd stepped into those shoes, number one, and number two, he was also coming to [Mother's] defense because at the point in time this is occurring, T.K. has backed his mother—backed, followed, whatever you want to call it—into a 4-foot foyer, he's pushed her, shoved her, flipped his arms up, whatever. That's caused her to go backwards, she screams. He's not backing up, he's not getting out of the situation—
>
> . . . .
>
> "MS. JORDAN: This is all happening, by all accounts, in—one accounts was seven seconds, the other was 15 seconds. Very short amount of time, so whether you want to impute the ability of an adult who's stepped into a parental role to use reasonable

7

force to discipline a child, not a normal situation of discipline. We're not talking about you're just not doing your homework, you're not minding—

"THE COURT: No.

"MS. JORDAN: —your P's and Q's, we're talking about you're physically confronting a parent.

"THE COURT: Correct.

"MS. JORDAN: And that's what Mr. Elliott stepped into, and that's—so whether it's the parental discipline rule being applied to Mr. Elliott in that situation or whether it's him being able to defend and assist [Mother], either of those provide him the defense to his contact with T.K. because he did not do nothing more than what was necessary to stop the situation, to separate the two."

This exchange shows that the trial judge allowed Elliott to argue for the parental discipline defense. It seems that Elliott's argument pertaining to the trial judge's ruling stems from the following statement the trial judge made before issuing his ruling:

"It is my opinion that he's not a stepparent. I was a stepparent for a long time, but I was married to the mother of her children. I don't think mister— it's my conclusion that Mr. Elliott is not in the position of a parent, he's a significant other with [mother] and he had been in the house for a long time. The kids were told to obey him and obey his reasonable rules that were in the household and to show him respect, and Mr. Elliott even testified that the relationship with all three kids was good up to a point in time.

I say all that just to let you know that I've listened closely here, and however his lip got busted, maybe it could be from the altercation between he and Mr. Elliott, maybe he bit his lip, I don't know, but the one thing that is clear is that Mr. Elliott put hands on this boy in a somewhat forceful manner to force him down."

Elliott characterizes this statement as the judge's rejection of the parental discipline defense because Elliott is not T.K.'s biological father or married to the mother The State characterizes the statement as dicta and an acknowledgement of the role that Elliott plays in T.K. and the other children's lives. The State argues that the trial judge's legal conclusion was the judge's statement:  "I think Mr. Elliott's response here was too

8

much. He put hands on him, forced him to the ground, caused the scratch on his back, and even—that's what the defendant admits occurred[.]"

The trial judge's conclusion of whether Elliott's actions were excused under the parental discipline defense is part of its duty to weigh the evidence as a finder of fact. Elliott's argument is that his actions should not have amounted to battery because he was disciplining T.K. as a parental figure, and the trial judge—acting as fact-finder—determined that Elliott was not.

We are not persuaded that the trial court erred in rejecting the parental discipline defense. Even if the parental discipline doctrine may be invoked by a boyfriend under the right circumstances, we consider and reject that the doctrine is applicable here. As this court acknowledged, parental discipline is a defense to battery only if the physical force was "reasonable and appropriate and with the purpose of safeguarding the child's welfare or maintaining discipline." *Wade*, 45 Kan. App. 2d at 139.

The State here entered into evidence photographs showing injuries to T.K.'s neck, a bruise to his elbow, a mark to his right shoulder blade, a scratch running down his back, and a mark to his lower back. In addition, the State entered into evidence a photograph showing T.K. with a swollen and busted lip. The State also points out that the trial judge concluded that Elliott was guilty because of the amount of force he used when he intervened between T.K. and his mother. And the trial judge implicitly ruled that the amount of force Elliott used was not reasonable and appropriate under the circumstances or necessary to safeguard T.K.'s welfare. Thus, substantial legal and relevant evidence existed to such a degree that a reasonable person could accept as being adequate to support the trial judge's conclusion rejecting Elliott's parental discipline defense.

9

*Did the Judge Apply the Correct Standard when Evaluating Elliott's Defense of Another Claim?*

The statute for defense of another, K.S.A. 2019 Supp. 21-5222(a), provides: "A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's *imminent* use of unlawful force." (Emphasis added.)

Elliott argues that the judge misinterpreted the defense of another statute because the judge applied an "immediate" instead of "imminent" standard to the use of unlawful force requirement. To support this assertion, Elliott points to the trial court's statement that T.K. was "not advancing" when Elliott intervened.

Statutory interpretation presents a question of law over which appellate courts have unlimited review. *State v. Alvarez*, 309 Kan. 203, 205, 432 P.3d 1015 (2019).

The problem with Elliott's argument is, as the State points out, that the trial court never used either "immediate" or "imminent" when describing the events that took place. Also, under the facts of this case, there is no difference between "immediate" and "imminent."

Elliott primarily relies on *State v. Hundley*, 236 Kan. 461, 693 P.2d 475 (1985) to support the need to differentiate between "imminent" and "immediate." In that case, the defendant was convicted by a jury of involuntary manslaughter for shooting her husband to death.

The defendant explained to the jury and presented uncontroverted evidence that she was subjected to harsh physical and mental abuse throughout her marriage.

10

Specifically, she claimed her husband had hit her with beer bottles many times in the past, and she felt threatened by a beer bottle on the night she shot her husband. On that basis, she claimed self-defense.

The self-defense instruction presented at trial stated, in part: "'A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's *immediate* use of unlawful force.'" 236 Kan. at 464. The instruction was derived from K.S.A. 21-3211, which is the previous codified version of K.S.A. 2019 Supp. 21-5222. See 236 Kan. at 464. Defendant argued that "the use of the word 'immediate' in the PIK instruction, rather than 'imminent,' as stated in the statute, constitute[d] error since it prevented the jury from considering the evidence concerning the long-term violence of the victim toward appellant." 236 Kan. at 464. Under the facts of the case, our Supreme Court agreed and reversed and remanded the case for a new trial. 236 Kan. at 469.

Here, there was no evidence that established a history of abuse between T.K. and his mother. On the contrary, the mother stated that the boys respected her and Elliott and obeyed the household rules until the issues related to T.K.'s father started to occur. Elliott also testified that he had a "real good relationship" with all three boys before the problems with T.K.'s father. With respect to the issues surrounding T.K.'s father, there was no evidence of any sort of physical altercation because of those issues. The mother characterized the issues as attitude problems, stating that she started to see the children doubt their self-worth and have anxiety.

The mother testified that she was traumatized after being pushed away by T.K. because she "never expected it coming from him." The evidence presented to the trial court here displayed that what took place between T.K. and Elliott was an isolated event.

11

The testimony also established that the entire altercation took less than 15 seconds. Thus, factually, there is no difference between "imminent" and "immediate" in this case.

Elliott also ignores the fact that the trial judge agreed that he had a right to intervene between T.K. and Mother, as evidenced in the trial judge's ruling when he stated:

> "I submit to Mr. Elliott that the proper thing for him to do in the situation was to—I don't think it was wrong for [Elliott] to intervene once he saw what happened. I think it was appropriate, would have been appropriate for him to say something to the boy, stop, and then get in between the two of them and leave it at that. His pure size and—his size and strength towers over a 12-year old boy. The boy should have or more than likely would have done nothing because it's true that the boy didn't do anything to try to fight Mr. Elliott.
> "I think that Mr. Elliott's response here was too much. He put hands on him, forced him to the ground, caused the scratch on his back, and even—that's what the defendant admits occurred[.]"

The ruling makes clear that Elliott was found guilty because of the amount of force Elliott used when he intervened between T.K. and his mother, not solely because Elliott intervened. And thus, Elliott's contention that the trial court applied the incorrect standard to his defense of another argument is baseless as a matter of fact and wrong as matter of law.

*Did the State Present Sufficient Evidence of Misdemeanor Battery?*

Elliott's final argument on appeal is that the evidence provided at trial was not sufficient to convict him of misdemeanor battery. Elliott again argues that he intervened to enforce discipline and protect the mother from T.K. and that the judge "followed a rule of risk of 'immediate' harm instead of 'imminent' harm."

When a criminal defendant challenges the sufficiency of the evidence, an appellate court decides whether, "'after reviewing all the evidence in a light most favorable to the prosecution, [it] is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.'" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

Elliott was convicted of misdemeanor battery under K.S.A. 2018 Supp. 21-5413(a)(1), which defines battery as "[k]nowingly or recklessly causing bodily harm to another person[.]"

The evidence in this case varied depending on the testimony of witnesses. T.K. testified that Elliott came from behind and put his face into the wall before Elliott then put him on his back on the ground and grabbed his throat. L.K. testified that he saw Elliott put T.K.'s face into the corner and then put T.K. on the ground, although what L.K. could have seen was disputed by Elliott. On the other hand, the mother testified that T.K.'s back was never on the ground; Elliott was never on top of T.K.; and T.K.'s face was never on the ground. Elliott likewise denied ever pushing T.K.'s face into the wall or putting T.K. on his back on the ground.

To corroborate the testimony of T.K. and L.K., the State introduced photographs of T.K. The photos depicted marks on T.K.'s neck, a bruise on his elbow, a mark on his right shoulder blade, a scratch going down his back, a mark on his lower back, and a swollen lip.

As stated earlier, this court does not reweigh evidence, resolve evidentiary conflicts, or make credibility determinations. *Chandler*, 307 Kan. at 668. From the evidence presented, when viewed in the light most favorable to the State, a rational fact-

13

finder could have found the defendant guilty beyond a reasonable doubt. And thus we affirm Elliott's conviction for misdemeanor battery in violation of K.S.A. 2018 Supp. 21-5413(a)(1).

Affirmed.